BROWNSVILLE FABRICS, INC., et al., Appellants,

v.

GULF INSURANCE COMPANY et al., Appellees.

No. 1120.

Court of Civil Appeals of Texas, Corpus Christi.

March 31, 1977.

Rehearing Denied May 12, 1977.

Richard B. Stone, Stone, Berryman & Giles, Corpus Christi, for appellants.

Paul M. Green, San Antonio, Adams, Graham, Lewis, Jenkins, Jones & Graham, McAllen, for appellees.

## OPINION

BISSETT, Justice.

The insureds in this case, under a "Scheduled Property Floater Policy", seek to recover losses which resulted from a fire that damaged the stock of merchandise in one of their stores and caused a business shutdown. The plaintiffs are Brownsville Fabrics, Inc. and McAllen Fabrics, Inc. The defendants are Gulf Insurance Company and William F. Havey, Stuart S. Jennings, Leroy James Nash, and Al P. Havey, individually, and doing business as Pan American Insurance Agencies. In addition to suing the insurer, Gulf Insurance Company, for the damages caused by the fire which they contend was due them under the policy, plaintiffs also sued the other named defendants for damages because of negligence in failing to provide them with the type of coverage which would have fully protected them from all damages to their stock of merchandise.

Trial was to the court, sitting without a jury. Judgment was rendered that plaintiffs take nothing against Gulf Insurance Company for any damage sustained to their stock of merchandise; that they take nothing against any of the defendants in their action for negligence; and that they recover from Gulf Insurance Company the sum of $78,000.00 for "business shutdown" under the policy, which recovery, however, was subject to a credit of $66,000.00 that had been paid by the insurer to plaintiffs prior to the date judgment was signed. Plaintiffs have appealed the judgment in its entirety.

Appellants, Brownsville Fabrics, Inc. and McAllen Fabrics, Inc., will be called "plaintiffs"; appellee, Gulf Insurance Company, will be designated as "Gulf"; and appellees, William F. Havey, Stuart S. Jennings, Leroy James Nash and Al P. Havey, d/b/a Pan American Insurance Agencies, will be referred to as "Agents".

## IN GENERAL

Plaintiffs were retailers and wholesalers of fabrics in the lower Rio Grande Valley. At all times pertinent to this appeal, they operated a store in Brownsville and a warehouse in McAllen. Agents, on or about December 12, 1969, solicited plaintiffs' business insurance. Plaintiffs then requested that Agents provide $400,000.00 coverage for the Brownsville store and $200,000.00 in like coverage for the McAllen warehouse. Because no one company would underwrite the complete coverage requested by plaintiffs and because cheaper fire and extended coverage insurance could be obtained by segregating those risks and placing them with companies authorized to deviate rates by the State Board of Insurance, Agents obtained four policies for plaintiffs. They consisted of three policies for fire and extended coverage which were written by insurance companies who are not parties to this suit, each of which provided a policy for one-third of the desired amount of fire and extended coverage; in addition, Gulf issued to plaintiffs a policy entitled "Scheduled Property Floater Policy", No. SP 4 70 46 91, which insured plaintiffs from December 12, 1969 until December 12, 1972. Attached thereto and forming a part thereof was a writing, which was denominated "Merchants Property Policy". Among other provisions, liability was limited to $400,000.00 for loss at the Brownsville store, and $200,000.00 for loss at the McAllen warehouse. It further provided for loss because of "business shutdown" at either of the locations at the rate of $6,000.00 per week, not to exceed 26 weeks.

There was also attached to Gulf's policy, No. SP 4 70 46 91, an endorsement styled "OTHER OR SPECIFIC INSURANCE ENDORSEMENT (EXISTING)".[1]

All of the policies were written on a reporting form basis with respect to plaintiffs' stock on hand. The three fire and extended coverage policies were on a monthly reporting basis. Gulf's policy provided for quarterly reporting.

On or about January 12, 1970, the fire and extended coverage for the Brownsville store was reduced from $400,000.00 to $125,000.00; the coverage on the McAllen warehouse was reduced from $200,000.00 to $60,000.00, and coverage in the amount of $90,000.00 was added because of the acquisition of a new store in McAllen. Three new policies covering fire and extended coverage in the reduced amounts for the Brownsville store, the McAllen warehouse, and the additional amount for the new store in McAllen, were issued by the same three companies who had previously issued fire and extended coverage policies for $400,000.00 coverage on or about December 12, 1969.

Gulf, pursuant to Agents' request, then executed and delivered a writing to plaintiff, which was also denominated "Merchants Property Policy". It was dated January 12, 1970 and limited liability on the Brownsville store to $125,000.00, limited liability on the McAllen warehouse to $60,000.00, and further provided for coverage on the new store in McAllen in the amount not to exceed $90,000.00. The "writing" constituted a rider to the original policy No. SP 4 70 46 91. Its only effect was to reduce the limits of liability on the Brownsville store and on the McAllen warehouse from $400,000.00 and $200,000.00 to $125,000.00 and $60,000.00, respectively, and to add coverage for the new McAllen store in an amount limited to $90,000.00.

On March 15, 1971, a fire occurred at the Brownsville store, which caused considerable damage to plaintiffs' stock of merchandise (stock) and to the building which housed the store. The building was repaired. Plaintiffs reopened the store for business on September 10, 1971.

Plaintiffs demanded that Gulf pay them $104,000.00 as damages for loss of stock, and $156,000.00 because of "business shutdown". The demand was refused. Suit was then filed.

The last report by plaintiffs on the Brownsville store prior to the fire was made on November 30, 1970, when they reported $75,000.00 worth of stock on hand. In the loss adjustments between plaintiffs and the three companies who issued the fire and extended coverage policies, plaintiffs, in their proofs of loss, claimed $25,000.00 due under each policy; they were paid $25,000.00 by each company for a total of $75,000.00. Plaintiffs also received a net of

---

1. It is agreed by the Insured, based upon a premium credit considered, that the amount(s) of specific insurance specified at the location(s) indicated below will be kept in force until the expiration of such insurance as noted herein unless otherwise agreed to in writing by the Company. If the Insured fails to comply with this requirement, this Company shall not be liable for that part of any loss which would have been recoverable or due thereunder had such specific insurance been in force, whether valid or not, or collectible or not. With respect to any specific insurance, this policy shall be considered as excess Insurance and shall not apply or contribute to the payment of any loss until the amount due from all such specific insurance whether collectible or not shall have been exhausted. However, this Company's liability shall not exceed the difference between the limit of liability under this policy at any specified location and the amount of specific insurance at such specified location for loss or damage arising out of the perils insured against by such specific insurance.

| Location | Perils | Amount of Specific Insurance | Expiration Date |
|---|---|---|---|
| 720 E. Elizabeth Brownsville, Texas | Fire and Extended Coverages & | 400,000. | 12/12/72 |
| 1721 Beaumont Ave. McAllen, Texas | Vandalism and Malicious Mischief | 200,000. | 12/12/72 |

All Other Terms and Conditions Remain Unchanged

$32,192.18 at a salvage sale for the damaged stock. Gulf, prior to judgment, paid plaintiffs (pursuant to an agreement between them) the sum of $66,000.00 as damages for "business shutdown".

STOCK COVERAGE POINTS OF ERROR

The trial court found: Gulf's policy was designed to provide coverage in the full amount desired at each location for all risks and hazards other than those included within the three fire and extended coverage policies; plaintiffs did not, at any time, "object to the means employed to provide the desired coverage nor to any of the provisions, terms and conditions of the policies"; no premium was charged by Gulf to plaintiffs for fire loss coverage to plaintiffs' stock; a short time after delivery of the policies, plaintiffs advised Agents that they desired to reduce the coverage on the Brownsville store from $400,000.00 to $125,000.00, and on the McAllen store from $200,000.00 to $60,000.00, and to add coverage of $90,000.00 on a new store at McAllen.

The trial court concluded: Gulf's policy did not provide coverage on the loss by fire to stock, as claimed by plaintiffs; there is no evidence of any agreement between plaintiffs and either Gulf or Agents for stock coverage in excess of $125,000.00 on the Brownsville store as of the date of the loss; there was no consideration paid to Gulf by plaintiffs for coverage of the stock loss due to fire under the policy in question; and, there is no evidence that any representation was made to plaintiffs by either Gulf or Agents that excess stock coverage would be provided for the Brownsville store.

The above findings of fact and conclusions of law are attacked by plaintiffs on points 1, 2, 3, 4, 5, 6A, 6B, 7, 9A, 9B, 10 and 13. They argue, in substance, that under the evidence, as a matter of law, Gulf's policy at the time of the fire on March 15, 1971 was a valid "all risk" policy, which, by its express terms provided insurance coverage for the fire damage and loss to the stock; that the undisputed evidence shows that Agents proposed to plaintiffs that they take out Gulf's policy in addition to the $125,000 underlying fire coverage, and Agents did, in fact, request the policy from Gulf, and Gulf did, in fact, issue and plaintiffs did, in fact, accept such written agreement, "dated January 12, 1970, to provide excess all risk stock coverage of $125,000.00 for loss at the Brownsville location above the underlying insurance coverage of $125,000.00 which existed at that time"; that under the undisputed evidence, an agreement was made between plaintiffs and Agents for stock coverage in excess of $125,000.00 on the Brownsville store; that they paid premiums for the coverage which they say covered the stock loss; and that consideration was paid to Gulf for the issuance of a policy that did insure them against loss to their stock by fire.

In addition to the foregoing findings of fact, about which plaintiffs complain in this appeal, the trial court found (Findings 13–15) that all policies were revised in accordance with plaintiffs' desires and requirements which reduced the coverage as requested by plaintiffs, and that such policies, as revised, were delivered to and accepted by plaintiffs. The trial court further found in finding 17:

"17. The means initially employed by Gulf to exclude fire and extended coverage from the ambit of the insurance protection provided by the policy in question was the attachment of an endorsement styled "Other or Specific Insurance Endorsement (Existing)". The policy, as initially delivered to Plaintiffs and accepted by them, required the maintenance of specific fire and extended coverage insurance in the amounts of $400,000.00 on the Elizabeth Street location in Brownsville and $200,000.00 on the Beaumont Avenue location in McAllen. This endorsement was attached to Plaintiffs' policy at the time of the fire loss which is the basis of this suit."

Findings 13–15 and 17 are not attacked in this appeal.

In a typical "all risk" policy, the insurer undertakes the risk for all losses of a fortuitous nature, which, in the absence of

fraud or other intentional misconduct of the insured, is not expressly excluded in the agreement. See *Fidelity Southern Fire Insurance Company v. Crow*, 390 S.W.2d 788, 792 (Tex.Civ.App.—Waco 1965, writ ref'd n. r. e.); 44 Am.Jur.2d Insurance § 1433 p. 297–8 (1969); 88 A.L.R.2d 1122, 1225 (1963). An "excess" policy is one that provides that the insurer is liable only for the excess above and beyond that which may be collected on other insurance. 32 Tex.Jur.2d § 420 (1962).

■ Gulf's policy became effective on December 12, 1969. When Gulf issued the rider on January 12, 1970, which reduced the limits of coverage on the locations existing at the time the policy was issued and added the new location in McAllen, it did not issue a new or revised specific insurance endorsement. Consequently, the endorsement which was attached to the original policy was in force at the time of the fire loss. The January 12, 1970 rider did not, change or reduce the required amount of specific insurance from $400,000.00 to $125,-000.00 on the Brownsville store. At the time of the loss, the limit of Gulf's policy on the Brownsville store, pursuant to the terms of the January 12, 1970 rider, was only $125,000.00, and not $400,000.00 as originally provided.

There is evidence that Agents devised a means of initially providing $400,000.00 coverage for the stock for the Brownsville store and $200,000.00 coverage for the McAllen warehouse at a premium saving to plaintiffs. Since certain fire and extended coverage insurers were permitted to deviate their rates downward by the State Board of Insurance, the fire and extended coverage risks could be segregated and written by one or more companies, depending on the total amount of exposure. The balance of the exposure could be covered in a scheduled personal property floater policy, where the rates could not be deviated, which would also provide for losses due to business shutdown. The latter type policy was the policy which was issued by Gulf. To prevent exposure on this policy under the premiums charged for fire and extended cover-age hazards which otherwise would have been covered, the specific insurance endorsement, which has been set out in full in a footnote to this opinion, was attached to and made a part of Gulf's policy. That endorsement, along with the "merchants property policy", formed integral parts of the "floater policy", and must be considered together. The limits of liability to personal property (stock) at each location are set out in the merchants property policy portion of the floater policy. The amount of specific insurance which is required to be maintained at each location is prescribed in the "specific insurance endorsement". The endorsement particularly provides that the insured cannot recover more than the difference between the limit of liability and the amount of specific insurance required by the endorsement.

The specific insurance endorsement, which required plaintiffs to maintain $400,-000.00 fire and extended coverage on the stock in the Brownsville store was never changed, altered or revised. It was in full force and effect on the date of the fire. It is conclusively shown by the evidence that plaintiffs did not maintain the required $400,000.00 fire and extended coverage. It is further conclusively shown by the evidence that Gulf did not consent in writing to a reduction in the amount of specific insurance that was required to be kept in force on the stock in the Brownsville store. Those undisputed facts, of themselves, are sufficient to sustain the conclusion by the trial court that "the policy in question did not provide coverage of personal property (stock) loss due to fire". Moreover, since the limit of liability with respect to the stock in the Brownsville store at the time of the loss was $125,000.00 and the amount of fire and extended coverage required was $400,000.00, there could not have been any liability imposed on Gulf since the required amount of specific insurance under the endorsement exceeded the limits of coverage under the merchants property policy.

Even if Gulf had issued a revised "specific insurance endorsement" at the same time it issued the revised merchants property

policy (the January 12, 1970 rider), and had provided for the maintenance of $125,000.00 fire and extended coverage on the stock in the Brownsville store, there would have been no recovery under the policy. The limit of Gulf's liability for loss to the stock in the Brownsville store on the date of the fire was in equal amount with the three fire and extended coverage policies on the contents of the store. The limit of liability was $125,000.00 and the amount of required fire and extended coverage would have been $125,000.00. Therefore, there was no difference between the limit of liability and the amount of required specific insurance. Where the "specific insurance endorsement", the "merchants property policy", and the other provisions contained in the "floater policy", all of which constitute the *policy* which was issued to plaintiffs by Gulf, are considered, it is clear that there can be no recovery for personal property (stock) loss unless the limit of liability *exceeds* the amount of required specific insurance. That is not the case here.

There is no evidence that Agents made any reference to "excess" insurance when they contacted plaintiffs concerning their business insurance. There is no evidence that plaintiffs requested that either Gulf or Agents provide plaintiffs with "excess" coverage.

Under the record here presented, Gulf's policy, as amended by the January 12, 1970 rider, considering the force and effect of the initial specific insurance endorsement, which was never amended or revised, did not provide insurance to plaintiffs for loss to their stock at the Brownsville store, which they sustained as a result of the fire. Points 1, 3, 4, 6A, 6B and 13 are overruled.

■ A premium is the consideration paid by a person for insurance protection or coverage. *Rosenstock v. Wheeler*, 310 S.W.2d 350 (Tex.Civ.App.—Houston 1958, writ ref'd). Here, the premiums charged by Gulf and paid by plaintiffs were not paid under a policy that provided stock coverage in excess of $125,000.00 on the Brownsville store. Points 9A, 9B and 10 are overruled.

There is no evidence that there was any direct communication between plaintiffs and Gulf until after the fire occurred. There is no evidence that Gulf, at any time pertinent to this appeal, knew that plaintiffs had requested or obtained a reduction in the amount of specific insurance on either the Brownsville store or the McAllen warehouse. There is no proof that Agents had any authority to bind Gulf by any agreement which they may have made with plaintiffs. The evidence conclusively shows that Agents were "soliciting agents" of Gulf and nothing more, and that they solicited insurance in the Rio Grande Valley Area for Gulf and other insurance companies. It is also established by the evidence that Agents did not have the authority to issue Gulf's policy or to amend or modify any rider or endorsement attached thereto.

■ There is no testimony from anyone that will support plaintiffs' contention that they had an agreement with either Gulf or Agents for "excess" coverage on the stock in the Brownsville store over $125,000.00. The personal contacts were between Agents and Mr. Angel Archeola, plaintiffs' manager of the Brownsville store. Mr. Archeola did not testify. Apparently, from the references to the statement of facts made by plaintiffs in their brief, their claim that such an agreement was made is based solely on three letters that were written by the Agents.

One of the letters was in the nature of a proposal which Agents submitted to plaintiffs. It was suggested:

"We propose two policies to cover Brownsville Fabrics, Inc., and McAllen Fabrics, Inc.

The first policy is a Fire and Extended Coverage Policy which will give protection against Fire. . . .

The second policy will be a Merchants Property Policy which gives all risk coverage. . . ."

Mr. Archeola then requested that Agents obtain $400,000.00 insurance on the Brownsville store. That information was relayed to Gulf by means of a letter from Agents. They requested:

"Please issue a merchants property policy as per your quotation of $400,000 limit at 720 E. Elizabeth, Brownsville, Texas, file # 3204 and $200,000 at 1721 Beaumont Ave., McAllen, file # 765 . . .

\*   \*   \*   \*   \*   \*

The MPP is to be excessed over stock fire and extended coverage which will be written on a stock reporting policy with Select Insurance Company having 25% of the line . . .

\*   \*   \*   \*   \*   \*

Please make these coverages effective December 12, 1969."

Gulf promptly issued a policy, which was delivered to plaintiffs on or about December 22, 1969. A few days later, plaintiffs told Agents that they wanted to reduce the insurance coverage on the Brownsville store in the amounts already noted. Following such notification, Agents wrote Gulf another letter and requested that Policy No. SP 4 70 46 91 be revised as follows:

"Brownsville Fabrics, Inc., at 720 East Elizabeth, change the amount of insurance to $125,000.

McAllen Warehouse at 1721 Beaumont Avenue, change the amount of insurance to $60,000.

And we want to add $90,000 on the McAllen Store at 104 South 16th Street."

On January 4, 1971, John Latham from the Corpus Christi Office of Gulf wrote Agent Al Havey requesting delinquent monthly reports for the months of September, October, November and December for the year 1970. He stated that the policy contained ". . . a number of errors resulting in much confusion . . ." but that he was hesitant to rewrite the policy if there would be "continued delinquency in filing monthly reports. . . ." Agent Al Havey sent the reports to Latham on January 6, 1971 with an accompanying letter inquiring as to the basis for rewriting the policy. On January 13, 1971, Latham replied that the policy must be rewritten to eliminate confusion over their limits of insurance; that the rates were "grossly inadequate"; and adjustment most likely would

be necessary; and, they needed to update their information regarding the specific fire and extended coverage policies. Nothing was done along the lines suggested by Latham.

It is not shown by the record that Gulf or Agents made any representations to plaintiffs that the Gulf policy provided excess coverage for loss of or damage to stock because of fire. There is no evidence of any confusion between plaintiffs and anyone with reference to the extent of coverage afforded by Gulf's policy, the conditions therein contained, any endorsement attached thereto, or the rate of premiums charged. Any confusion which may have existed was solely in Gulf's office. That confusion is understandable. The original policy covered two locations and the specific insurance endorsement and the "merchants property rider", as originally written covered only those two locations. The execution and delivery of the January 12, 1970 rider superseded the previous rider and not only reduced the limits of liability for the two original locations but added liability for a third location, all without changing anything in the specific insurance endorsement. Under those facts, it was reasonable to assume that perhaps the premiums which were being charged were inadequate.

There is no evidence that Agents made any representation, written or oral, to plaintiffs that "stock coverage in excess of $125,000.00 would be provided". The fact that Agents used the words "The M P P is to be excessed . . ." in their letter to Gulf is not evidence that they made the asserted representation to plaintiffs. There is no support in the evidence for plaintiffs' claim that an agreement was made between them "and either Agents or Gulf for personal property (stock) coverage in excess of $125,000.00". Points 2, 5 and 7 are overruled.

Plaintiffs assert in points 11 and 12 that the undisputed evidence conclusively shows that Gulf and Agents waived any ground of defense which they may have had to the action brought by plaintiffs, and that they are estopped to assert any defense thereto.

They base their assertions on the grounds that Gulf and Agents had knowledge of so-called discrepancies, mistakes, confusion, errors and inadequacy of premium charges, and concealed such facts from plaintiffs.

■ Waiver is generally defined as the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Massachusetts Bonding & Insurance Co. v. Orkin Exterminating Company*, 416 S.W.2d 396 (Tex.Sup.1967). Estoppel to assert a right can only exist where the person who is sought to be estopped has a valid right. See *Bailey v. Sovereign Camp, W.O.W.*, 116 Tex. 160, 286 S.W. 456 (1925). For the elements required in order for an equitable estoppel to exist, see *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929 (1952). "In order for an estoppel to exist, it devolves upon the party seeking the advantage thereof to establish that he has been misled to his injury." *Concord Oil Co. v. Alco Oil & Gas Corp.*, 387 S.W.2d 635, 639 (Tex.Sup.1965).

■ The doctrines of waiver or estoppel cannot enlarge or extend coverage as defined in an insurance contract; such an application exceeds the function of those doctrines. *Minnesota Mutual Life Insurance Company v. Morse*, 487 S.W.2d 317, 320 (Tex.Sup.1972); *Massachusetts Bonding & Insurance Co. v. Dallas Steam Laundry & Dye Works*, 85 S.W.2d 937, 939–42 (Tex.Civ. App.—Eastland 1935, writ ref'd); 1 ALR3d 1139, 1147 (1965); 45 C.J.S. Insurance §§ 616–17 (1946).

■ There is no evidence that Gulf had any notice or knowledge, actual or constructive, of any representations or agreements, if any, between Agents and plaintiffs. There is no evidence that Gulf had notice of or consented to the reduction of the amounts of fire and extended coverage insurance with the other companies at any time that could possibly amount to a waiver of the defenses urged by them or to an estoppel to plead and assert those defenses. The fact that Agents had knowledge that three fire and extended coverages were reduced from $400,000.00 to $125,000.00 on

the stock in the Brownsville store will not support plaintiffs' claims of waiver and estoppel against Gulf. It is settled law that a soliciting agent's knowledge of the reduction of coverage, without more, cannot be made the basis of either waiver or estoppel against an insurer where the insurer did not have knowledge of such reduction and where the agent had neither actual nor apparent authority to issue the policy or provide coverage. *Home Ins. Co. of New York v. Lake Dallas Gin Co.*, 127 Tex. 479, 93 S.W.2d 388 (1936, opinion adopted).

■ Neither Gulf nor the Agents made any actionable misrepresentations to plaintiffs as to the nature and extent of their fire insurance coverage at any of their business locations, nor did they conceal any material fact from plaintiffs pertaining to such coverage, nor did they fail to disclose any material facts to plaintiffs with respect thereto. Plaintiffs' claim of waiver and estoppel against Gulf cannot be sustained. Points 11 and 12 are overruled.

## NEGLIGENCE POINTS OF ERROR

■ Defendants also contend that they were entitled to a recovery against Gulf on the ground that it was "guilty of acts and omissions constituting negligence" which "was the proximate cause of Plaintiffs' stock loss damages due to the fire", because:

"... the undisputed evidence shows that Gulf knowingly 'hid behind the log' on certain so-called erros (sic), mistakes, omissions and inadequate premium charges pertaining to the policy in question and concealed such facts if they existed from Plaintiffs until after the fire loss at which time Gulf asserted prior to this suit and as defenses in this suit such errors, mistakes, confusion, omissions and inadequate fire premium charges to restrict and carve out its fire loss liability to Plaintiffs for Plaintiffs' stock loss, all to the damage of Plaintiffs in the amount of $109,000.00."

A detailed summary of the evidence under the points on negligence would amount to a repetition of what has already been

said. Further discussion is not necessary. The trial court found that the Agents were not negligent in their dealings with plaintiffs, that Gulf was negligent in failing to issue a revised specific insurance endorsement when it revised the coverage rider on January 12, 1970, but that such negligence was not a proximate cause of any of the damages suffered by plaintiffs. After reviewing the record in its entirety, we find no evidence of any negligence on the part of Gulf which proximately caused any of the damages sustained by plaintiffs. Points 14, 15, 16, 17, 18 and 19 are overruled.

### BUSINESS SHUTDOWN POINTS OF ERROR

■ Gulf, prior to trial and in accordance with an agreement between it and plaintiffs, paid plaintiffs $66,000.00 for business shutdown. The trial court found that plaintiffs were entitled to compensation for 13 weeks' shutdown; consequently the previous tender by Gulf was credited in the judgment, and plaintiffs were awarded an additional $12,000.00 by the judgment itself.

The trial court, in explanation of the 13 weeks' shutdown award, found: 1) the building which housed plaintiffs' Brownsville store could have been cleared of the stock and debris and repairs commenced within 4 weeks from the date of loss; 2) the repairs to the building could have been completed within 7 weeks after they were begun; and 3) plaintiffs could have restocked the store and resumed business at the Brownsville location within 2 weeks after the repairs to the building were finished. Plaintiffs attack the findings by "no evidence" (20) and "against the great weight and preponderance of the evidence" (21) points of error. In point 23, they contend that the trial court erred in concluding that plaintiffs are entitled to recover for only 13 weeks of business shutdown because there are no proper findings of fact which support such a conclusion of law.

Plaintiffs ceased business operations at their Brownsville location on March 15, 1971 (the date of the fire). They resumed business operations at that location on September 10, 1971. Those facts are undisputed.

Following the fire, discussions between the parties commenced immediately. Plaintiffs were represented by Mr. Wilbur Stepner, their adjuster, and Gulf was represented by Mr. Don Lassiter, its adjuster. The parties agreed to take a joint inventory which was to be valued on the date of the loss by a firm in New York, where the permanent records of the stock which had been sold to plaintiffs were kept. It is undisputed that a period of 4 weeks was required to take the physical inventory and send it to New York to be valued. Apparently, there was a delay in obtaining the values from New York. Stepner testified that some of the delay was caused by the cancellation of appointments in New York by persons who were representing Gulf in the matter. The exact delay, if any, in terms of days or weeks by acts on the part of Gulf's representatives was not established.

After the inventory had been valued in accordance with the agreement, the damaged stock was sold at a salvage sale, which was conducted at the site of the Brownsville store. The sale was held on April 20, 1971. Mr. Frank Joyce, a representative of a salvage company, testified that it would not have been reasonable to have removed the damaged stock to a different location pending the salvage sale. It took the buyer approximately one week to get the stock out of the premises following the sale. There is testimony from others that the salvage sale could have been held by March 27, 1971, that the damaged stock could have been moved out of the building by April 3, 1971, and that repair work could have been started at any time after April 3, 1971.

Mr. Anthony Carnesi, the owner of the building where the Brownsville store was located and plaintiffs' lessor, commenced studying the necessary repairs to the building immediately after the fire. He testified, in substance, that he did everything prudently possible to complete the repairs to the building without delay. He stated

that he needed time to adjust his own loss with his own insurance company, which was represented by Lassiter (who also represented Gulf in the claims which were made by plaintiffs). He needed (and used) Mr. Robert Velten, an architect. He suggested to Donald B. Ferguson, Inc. (Ferguson) that it prepare a proposal concerning the necessary repairs. This was done promptly and a written proposal was submitted to him on March 26, 1971. It was then reviewed by Velten, and the proposal, with very few changes, was accepted by Carnesi on May 4, 1971. Work commenced immediately. Carnesi further testified that plaintiffs did nothing to delay the repair work.

The repairs, as approved on May 4, 1971, included replacement of half of the floor tile. Work was supervised by Mr. George Villarreal, Ferguson's representative. Several days were required to clear the store of debris left from the salvage sale before actual work could be started. The contractor worked continuously on the repairs until June 3, 1971, when he was informed by Velten and Carnesi to temporarily stop the repair because additional changes would be made. Repair operations were suspended. Work was resumed on June 28, 1971. Villarreal stated that the repairs as initially contemplated by the contract could have been completed within two to four weeks from the day work was halted. Instead, the changes in the repair work delayed turning over the keys of the building to plaintiffs until August 6, 1971.

The changes which were made following the cessation of repair work on June 3, 1971 were substantial. In the main, the additional repairs required further repairs to the roof of the building, the resetting of a window, and the replacing of the entire floor instead of only half of it as was originally contemplated. While plaintiffs requested some changes after the repairs were under way, it is conclusively established that those changes caused very little delay, if any, in completing the work.

Presumably, the changes which were made were necessary for the structural soundness, safety, and practical utility of the building. The exact reason for the changes was not established; however, Carnesi in response to questions asked him testified:

"Q Now, after the construction commenced, were there any additions or changes made in regard to the work that Ferguson Construction Company was to do on the building?

A Yes. We entered into some additional agreements whereby the contractor would do additional work.

Q Who had requested these changes, do you recall, or additions?

A Well, there are two factors involved: One, in the repair of a building that has been in a fire, sometimes you do not know what all the damage is or what the best means of repairs is until you actually get into the construction of it.

So as an example, with regard to the roof, the initial proposal is made by the contractor. We were not sure just what direction to take at that point, but as time went on, why, we decided the whole roof needed to be changed in view of the possible danger of the weakening that would have resulted as a result of the high heat that occurred to the building during the fire."

Carnesi's testimony was not disputed. It supports a reasonable inference that the need for additional repairs, which dictated a change in the repairs originally agreed upon, was not discovered until after work had commenced pursuant to the initial proposal and agreement. There is no evidence that the additional repair work was not made necessary by the fire. There is nothing to indicate that Carnesi, Velten, plaintiffs, or the contractor did anything to delay the completion of the repairs. The record shows that the contractor completed the work with dispatch and in a workmanlike manner.

Mr. Abraham Baum, an executive of plaintiff corporation, testified that as a general rule it takes from three to four weeks to restock a store similar to the Brownsville store and to get it ready for retail sales after the building is finished.

That testimony was not contradicted. It is conclusively established that the store in question was restocked after August 6, 1971 and reopened for business on September 10, 1971.

A salvage sale by March 27, 1971, in the light of the undisputed evidence that 4 weeks were required to value and price out the contents of the Brownsville store following the fire, would not have been feasible. The actual sale was held some 5 weeks after the fire. That was not an unreasonable delay. About 1 week was required to clear the premises following the salvage sale. The overwhelming preponderance of the evidence is that actual repairs to the building where the store was situated could not have been commenced until after the expiration of at least 6 weeks from March 15, 1971. The actual repairs, including the 3 weeks during which they were suspended, required approximately 13 weeks to complete. The store was actually restocked in about 5 weeks from the date that the keys to the building were delivered to plaintiffs and in about 4 weeks from the date that the repairs were completely finished.

There is some evidence to support the trial court's findings. Point 20 is overruled.

However, when all of the evidence is considered and weighed, together with all inferences that can reasonably be drawn therefrom, both in support of and contrary to the findings of fact which have been challenged, we are of the opinion and so hold that the findings that the building could have been cleared and repairs commenced within 4 weeks from the date of the fire, that the repairs could have been completed within 7 weeks after they were commenced, and that the store could have been restocked and retail sales operations resumed therein within 2 weeks after the completion of the repairs to the building, are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. Points 21 and 23 are sustained.

We have carefully considered all of plaintiffs' remaining points of error. They are overruled.

### DISPOSITION OF THE APPEAL

Those portions of the judgment which decreed: 1) that plaintiffs take nothing against Gulf in their action to recover "for loss of stock by fire" under Gulf's policy, and 2) that plaintiffs take nothing against Gulf and the Agents "on the claim predicated upon negligence" are affirmed. That portion of the judgment which awarded plaintiffs a recovery against Gulf for a period of 13 weeks "business shutdown" for $78,000.00, which was credited with $66,000.00, resulting in a net recovery to plaintiffs of $12,000.00, is reversed and the cause with respect to plaintiffs' action for a recovery under the "business shutdown" provision of Gulf's policy is remanded to the trial court for a new trial. The action for a recovery for "business shutdown" is severed from the other actions brought by plaintiffs. Costs of this appeal are taxed 50% to plaintiffs and 50% to Gulf.

The judgment of the trial court is AFFIRMED IN PART and REVERSED AND REMANDED IN PART.