282 A.2d 194.

ROY CHASSE *vs.* NEWARK INSURANCE COMPANY.

OCTOBER 12, 1971.

PRESENT: Roberts, C. J.. Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J. The plaintiff brought this action under a policy of insurance issued by the defendant to recover damages resulting from the sinking of his cabin cruiser. The case was heard before a justice of the Superior Court

and a jury. At the conclusion of the plaintiff's evidence on the question of liability, the defendant moved for a directed verdict. The trial justice denied this motion and then plaintiff presented evidence on the question of damages. At the conclusion of the presentation of such evidence by the plaintiff, both sides rested. The jury returned a verdict for the plaintiff in the sum of $3,052. Judgment was entered on the verdict and, after the denial of its motion for a new trial, the defendant filed this appeal.

The following facts are pertinent to the issues raised by this appeal. On July 27, 1966, plaintiff was the owner of a cabin cruiser upon which defendant issued a marine policy to plaintiff. The relevant provisions of the policy, which are contained in the "Yacht Endorsement," section A, subsection B, appended thereto, read as follows:

"1. Perils — Against all risks of physical loss or damage, subject to the stated deductible, except as may be excluded by provisions elsewhere in this policy or by endorsement hereon.

"2. Exclusions — This policy does not insure against:
(a) Wear and tear, gradual deterioration, inherent vice, marine borers, vermin, repair or replacement of a part in which a latent defect is found.
* * *
(e) Loss, damage or expense caused by failure of the assured to maintain the yacht in a seaworthy condition."

The boat was in the water when the policy of insurance was written and remained in the water until September 29, 1966, when it sank. The plaintiff testified in pertinent part as follows. He used the boat regularly on weekends during the summer of 1966 and occasionally during the week he was on vacation. He had no difficulty with water in the bilges in July of 1966. He used the boat up and down Narragansett Bay and went to Block Island once in August of 1966. In reply to a question as to whether his

attention was called to any water in the bilges on any of those trips, he said:

"No, there was a small amount, a gallon or so, occasionally. There was occasionally a gallon or so of water the boat would take on in a small trip."

He did not know where the water came from. When asked how he rid the boat of the water, he replied that the boat had an automatic bilge pump which pumped the water over the side. Other than having trouble with an overheated engine, which he had corrected prior to September 29, 1966, he had no difficulties at all with the boat and to his knowledge nothing was wrong with the boat and it was in "top flight" condition just prior to September 29, 1966. He last used the boat on September 25, 1966, and, after a trip to Prudence Island, some thirty or forty miles, with no difficulty, he moored the boat at his mooring in the Kickamuit River where it sank on September 29, 1966. He did not see the boat again until after it had been towed by the Coast Guard to Stanley's Boat Yard in Barrington.

While defendant's counsel was cross-examining plaintiff, he questioned him about a sworn document which plaintiff had filed in connection with the processing of his claim with defendant. The defendant introduced this document as a defendant's exhibit for identification and not as a full exhibit. The defendant questioned plaintiff about the contents of that document, specifically about a reference therein by plaintiff to "a leaking stuffing box." The exact statement to which defendant's counsel referred reads as follows:

"The stuffing box on the starboard shaft sprang a leak. The automatic bilge pump must have run until the battery went dead and then the boat took on water."

The plaintiff admitted during cross-examination that he learned that the stuffing box was leaking from someone else other than personal observation.

Charles Jackson, an employee of Stanley's Boat Yard, was called as a witness by plaintiff. His testimony is, in substance, as follows. He first saw plaintiff's boat on September 29, 1966, at Stanley's Boat Yard, where it had been brought by the Coast Guard. At that time there was some water remaining in the bilges. After pumping this out, he inspected the boat while it was still in the water to see if there were any holes in the bottom or anything of that nature that would cause it to sink. In the course of this inspection, while he was down under the back end, he found two stuffing boxes[1] on the starboard side "dripping quite a bit of water." The check nuts and glands which held the stuffing box packing in place were still intact. He stated that he could not recall exactly whether the check nut was loose or not, but he knew that there was considerable water running in through by the shaft.

He then went to get his tools and by tightening the nut he stopped the flow of water. He pumped the bilges dry and left the boat in the water. His inspection revealed nothing else was wrong with the hull and other evidence in the record indicates that no other repairs were ever made upon the boat. The following day he again inspected the bilges and found that they were still dry. He did not replace the flax packing around the shaft and in the stuffing boxes and, to his knowledge, the same packing was still in there that was there prior to the boat's sinking. After the sinking and after the tightening of the nut the boat was put into the water the following June and was in the water without incident until the fall of 1967.

He stated in direct examination that periodically stuffing boxes do have to be tightened up, as when a boat is commissioned in the spring of the year; that as a general rule

---

[1] A stuffing box is essentially a device to prevent leakage of water, consisting of a box or chamber, piston rod and follower to compress the contained packing in the box.

a person would make sure that the stuffing boxes have adequate packing in them; that at times throughout the season, as this packing wears, they will begin to leak or weep; that some get worse than others depending on conditions; that some packing will stay a lot longer than others; and that as far as he knew, the same packing was in the stuffing box now as was in there when plaintiff bought the boat. The only thing he found out of the ordinary was this leak or weeping through the stuffing box.

When asked in direct examination whether he had an opinion as to whether or not the leakage in the stuffing box caused the boat to sink, he replied:

> "That's hard to say because it all depends on the size or the amount of water coming in. If there was an automatic bilge pump on it to take care of it, why it shouldn't sink. If there is a malfunction of the automatic bilge pump, then you're in trouble."

He explained that you tighten up the packing gland from the inside of the stuffing box on the inside of the boat. During cross-examination by defendant's counsel the witness stated that the cause of the sinking of the boat was a leaking stuffing box and that it could be repaired by the tightening of the nut. He said that the water came into the boat because the packing gland needed tightening and not because the packing deteriorated to such an extent that it had to be replaced. He also testified that the loosening of the nut is a gradual process of wear and tear, but he qualified this by stating that it does not necessarily mean that if the packing wears that the nut has loosened. And then the following colloquy took place.

> "Q All right, so if the nut could have stayed in the same position it was when the boat went in the water, but the packing could have worn and allowed the water to come in —
>
>     \* \* \*

"The Witness: Yes, that is just what takes place with the shaft revolving on that packing, and it does wear.

"Q And also does the check nut ever vibrate loose?

"A I have seen instances of that happening.

"Q And you tightened this check nut when you —

"A You have to tighten, you have to loosen the check nut in order to tighten the gland, then you —

"Q Bring the check nut —

"A Back against the gland.

"Q And you did this?

"A I did that. That's the normal procedure for tightening the gland in."

At this point plaintiff rested on the issue of liability, reserving his right to present further evidence on the question of damages. The defendant then moved for a directed verdict. The trial justice denied this motion and then plaintiff proceeded with his case. He called as a witness a marine surveyor connected with Stanley's Boat Yard, who testified as to the extent of plaintiff's damages. At the conclusion of this witness's testimony both sides rested and the case was given to the jury which returned a verdict for plaintiff.

I

The defendant's first assignment of error is that the trial justice erred in denying its motion for a directed verdict. It bases this argument on two grounds: (a) that the loss of plaintiff's boat was not a "risk" within the contemplation of the policy because it was not caused by a fortuitous event or casualty, and (b) that even if the condition which caused the boat to sink was a "risk" within the contemplation of the policy, recovery must be denied because that condition falls within the policy exclusions. Thus, the question presented for our consideration is whether, as a matter of law, the condition which caused plaintiff's boat

to sink is a risk within the contemplation of the policy and, if so, whether or not it falls within either of the two exclusions referred to earlier in this opinion.

### A

We consider, first, defendant's argument that, as a matter of law, the loss of plaintiff's boat was not a "risk" within the contemplation of the policy because it was not caused by a fortuitous event or casualty. We agree that when an insured sues on a policy of marine insurance the burden is on him to prove that the loss was caused by a peril covered by the policy. *Pacific Dredging Co.* v. *Hurley,* 65 Wash.2d 394, 397 P.2d 819; 21 Appleman, *Insurance Law and Practice* §12237.

However, the question before us involves the correctness of the denial of defendant's motion for a directed verdict. It is well settled in this state that a verdict should not be directed for a defendant, if on any reasonable view of the evidence, the plaintiff can recover. *Cannon* v. *Staples,* 46 R. I. 301, 127 A. 145. As the court said in *Morrarty* v. *Reali,* 100 R. I. 689, 695, 219 A.2d 404, 407-08:

> "On a motion for directed verdict, the trial justice must view the evidence in the light most favorable to the non-moving party without weighing it or passing on its credibility, and, if such evidence is reasonably open to different conclusions, the motion should be denied."

The defendant argues that plaintiff presented no evidence from which it could have been inferred that the sinking resulted from a casualty or specific fortuitous event. It points to the uncontradicted evidence that, other than the leakage in the stuffing box, there was nothing wrong with the boat. The defendant relies to a great extent on Mr. Jackson's testimony that the sinking was caused by the leaking stuffing box and that the loosening of the nut was a gradual process of wear and tear.

The difficulty we find with Mr. Jackson's testimony is

the obvious inconsistency in his answers. In direct examination, in answer to a question by plaintiff's counsel inquiring if he had an opinion as to " * * * whether or not the leakage in the stuffing box caused this boat to sink?" he replied:

> "That's hard to say because it all depends on the size or the amount of water coming in. If there was an automatic bilge pump on it to take care of it, why it shouldn't sink. If there is a malfunction of the automatic bilge pump, then you're in trouble."

In reply to another question, he said that he was not sure there was a malfunction on the part of the bilge pump. Earlier in his testimony he testified that he could not recall "exactly" whether the check nut was loose or not, but that he did know "there was considerable water running in through by the shaft."

Notwithstanding the inconsistencies in Mr. Jackson's testimony, we believe there is evidence in the record from which it can reasonably be inferred that the sinking of plaintiff's boat resulted from a fortuitous event. The determination of the question whether such sinking was caused by a risk contemplated by the policy is a question of fact and on this record was properly submitted to the jury.

## B

We agree with defendant's statement that even if it is conceded arguendo that the condition which caused plaintiff's boat to sink was a "risk" within the contemplation of the policy, the motion for a directed verdict should have been granted if that condition falls within any of the policy exclusions. However, we do not agree with defendant's argument that the evidence compels the conclusion that the sinking was attributable to causes specifically excluded from the coverage of the policy. The defendant refers to the policy exclusions which provide that the policy does not insure against wear and tear or gradual deterioration,

loss, damage or expense caused by failure of the assured to maintain the boat in a seaworthy condition.

The defendant bases its argument relative to the exclusion for wear and tear or gradual deterioration mainly on Mr. Jackson's testimony. We reject this argument for the same reasons we rejected defendant's argument in Part I(A) of this opinion.

In discussing the exclusion for loss caused by failure to maintain the boat in a seaworthy condition defendant has cited cases involving the question of seaworthiness, burden of proof with respect thereto, and certain presumptions. However, we do not believe these cases are apposite here. As we have noted above, we are now considering defendant's contention that the trial justice erred in denying its motion for a directed verdict. The only question before us is whether the evidence with regard to the exclusion for loss caused by failure to maintain the boat in a seaworthy condition is reasonably open to different conclusions. We believe that it is. We cannot agree with defendant's contention that the only logical inference which a jury could have drawn was that sinking resulted from wear and tear, gradual deterioration and the plaintiff's failure to maintain his boat in a seaworthy condition. On the record before him, the trial justice correctly submitted this question to the jury.

For the reasons stated we hold that the trial justice did not err in denying defendant's motion for a directed verdict.

## II

The defendant next contends that the trial justice erred in instructing the jury as to the definition of "seaworthiness." After instructing the jury on the meaning of seaworthiness, to which no objection was made, the trial justice granted plaintiff's request to charge that:

> "A ship is not unseaworthy where a defect in a ship is such that the defect can be remedied on the spot in a short time by materials available."

The defendant objected to the trial justice's definition of "unseaworthy." It argues, in substance, that the instruction is not pertinent to the evidence and that it was not only erroneous but also highly prejudicial to it. We do not agree.

The definition as given is a correct one. *See* Black's Law Dictionary, (4th Ed. Rev. 1968) at 1708. But even if we assume arguendo that it was erroneous and not relevant to the evidence, it does not necessarily follow that the trial justice committed reversible error. As the court said in *Anter* v. *Ambeault,* 104 R. I. 496, 501, 245 A.2d 137, 139:

> " * * * reversal is unwarranted where no prejudice resulted to the complaining party. We believe the most prudent test for determining whether or not an erroneous charge is reversible error should turn on whether it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party."

The defendant, as the appellant, has the burden of persuading this court that the jury could have been misled to its prejudice by the challenged instruction. It has failed in that burden. When the instruction objected to is read in the context of the entire charge, especially that portion relating to the question of seaworthiness, we are not persuaded that the jury could have been so misled.

### III

The defendant's final assignment of error is that the trial justice erred in denying its motion for a new trial. Although the trial justice's decision denying the defendant's motion is very brief, the defendant has not persuaded us that the trial justice failed to perform the duties required of him as set forth in *Barbato* v. *Epstein,* 97 R. I. 191, 196 A.2d 836, or that having done so, he overlooked or misconceived any material evidence on a controlling issue or was otherwise clearly wrong. This was the defendant's burden. *Labbe* v. *Hill Brothers, Inc.,* 97 R. I. 269, 197 A.2d 305. Since it

has failed to sustain such burden, we must affirm the ruling of the trial justice denying its motion.

The defendant's appeal is denied and dismissed, and the case is remitted to the Superior Court for further proceedings.

Mr. Justice Kelleher, with whom Mr. Justice Joslin joins, dissenting. The majority's opinion leaves one question unanswered, namely, what was the "fortuitous event" that caused the sinking of the cabin cruiser? It is my belief, after a careful and considerate reading of the record, that the plaintiff failed to produce any competent evidence which would support an inference that the plaintiff's loss was covered by his policy.

I have no quarrel with the proposition that inconsistencies in testimony are a matter for the jury as it determines the credibility of a witness. It is up to the fact finder to pick and choose such portions of the testimony as it deems worthy of belief. See *Russian* v. *Lipet*, 103 R. I. 461, 238 A.2d 369. Nor do I dispute the basic rule that, when a defendant moves for a directed verdict, the trial justice is bound to view the evidence in a light most favorable to the plaintiff and give him the benefit of all reasonable inferences which can be properly drawn from the evidence free of any question of credibility. See *Gleason* v. *Almac's, Inc.*, 103 R. I. 40, 234 A.2d 350. This rule, however, rests upon the condition that evidence has been adduced which would support the so-called reasonable inference. In ruling upon a motion for direction a trial justice cannot assume what the evidence and its reasonable inferences do not show. *Murphy* v. *United Electric Rys.*, 64 R. I. 168, 11 A.2d 440.

The only competent evidence presented by plaintiff as to the cause of his boat's submersion came from the boatyard's employee. While this witness initially in his direct testimony said that he could not "recall exactly" whether

or not the check nut on the starboard stuffing box was loose, the employee then proceeded to tell the jury that he " * * * got some tools * * * and tightened the thing [the check nut] up and stopped the flow of water." In cross-examination he agreed that the sinking was attributable to the leaking stuffing box and that the leak could have been repaired had the nut been tightened. Later on, in redirect examination, he concurred with a statement of plaintiff's counsel that the " * * * water came into the boat because * * * the packing gland needed tightening and not because the packing deteriorated to such extent it had to be replaced." On recross-examination he conceded that the loosening of the nut was part of the gradual wear and tear that occurs on a boat.

Consideration of the motion for a direction necessitates a detailing of the nature and function of a stuffing box. As explained to the jury, a stuffing box is found in the inner-stern portion of a boat. The stuffing box is a chamber which encompasses the propeller shaft. The box contains a packing of woven pieces of grease-impregnated flax. The packing is placed in and around the shaft and because it is impervious to water, the packing is designed to prevent the seawater from entering the bilges because of the opening in the hull through which the shaft passes.

When the packing is first placed in the stuffing box, the check nut is tightened. The tightening of the nut compresses the packing around the shaft at the point where the shaft enters the hull. As the boating season progresses and the shaft continues to rotate, there occurs a gradual wear and tear of the packing. As the packing wears, there occurs a leakage at the stuffing box which increases with the passing of time. The nut can now be tightened further, or if you will, the nut is loose and can be tightened. When the nut is tightened, the packing is once again compressed around the shaft. The aperture is closed and the

inboard flow of seawater is either eliminated or reduced to a level where it can be easily disposed of by the bilge pump. Although the employee observed that a troublesome situation would arise if there was a malfunction in the operation of the pump, his assertion that such an event was a "possibility" was stricken from the record.

A marine policy, such as the one issued plaintiff, covers only risks and not certainties such as wear and tear. Although plaintiff's policy is an "all risk" policy, there must be a fortuitous event to impose liability upon defendant. 5A Appleman, *Insurance Law and Practice* §3272. It was plaintiff's burden to produce some evidence that would support an inference that the sinking was caused by some extraordinary circumstance contemplated by his policy. Try as I may, when I add up all the alleged inconsistencies alluded to by the majority, they do not afford any reasonable basis for a conclusion that would require defendant to compensate its insured.

The inspection of the ship's hull showed it to be sound. There were no holes in its bottom that would cause the sinking. There is no evidence that the boat ever struck any underwater obstruction or that, as it lay at anchor, it was subjected to any unusual violence of wind and wave. On the other hand, the employee told of the dripping starboard stuffing boxes, his tightening of the check nuts, the pumping out of the bilges and the dry condition of the bilges when he returned the next day.

The only reasonable inference that can be drawn from the evidence is that during the time the plaintiff's boat was at its mooring, water passed through the worn packings in the stuffing boxes and collected in the bilges in such an amount that it eventually caused the cabin cruiser to sink. In the words of the plaintiff's own witness, the loss was due to "wear and tear" and as such, it is not compensable.

I must, therefore, respectfully dissent as I believe that the trial justice should have granted the motion for a directed verdict.

*Joseph E. Marran, Jr.,* for plaintiff.

*Hinckley, Allen, Salisbury & Parsons, Guy J. Wells, Ernest C. Torres,* for defendant.