**Charles MILES, Appellant,**

v.

**ROYAL INDEMNITY COMPANY and Clyde Hoke, Appellees.**

No. 1381.

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 30, 1979.

Opinion on Motion for Rehearing Oct. 22, 1979.

Rehearing Denied Nov. 15, 1979.

Melvin A. Krenek, Beckmann, Stanard & Olson, San Antonio, for appellant.

Thomas M. Andrews, Aransas Pass, for appellee; Charles W. Kelly, Ross, Griggs & Harrison, Houston (on rehearing).

## OPINION

NYE, Chief Justice.

This is a suit brought by the insured boat owner, Charles E. Miles, against the insurer, Royal Indemnity Company, to recover the cost of repairs to his pleasure boat which sank at her moorings. Royal Indemnity defended under the "unseaworthiness" exclusion in the "all risks" yacht insurance policy. The jury answered special issues in favor of the boat owner, Miles. The trial judge however, granted the insurance company's motion for judgment non obstante veredicto and entered a take nothing judgment for Miles. Miles appeals.

Miles purchased a used 38 foot Chris Craft Commander cabin cruiser called "Alyson" for $12,000.00 for his family's use at their summer home in Rockport, Texas. Miles applied to Royal Indemnity Insurance Company for an insurance policy to cover the boat. The insurance company sent a marine surveyor to examine the boat and to issue a report to Royal Indemnity concerning the insurability of the boat. The surveyor found the boat in excellent condition and returned a favorable report with two minor recommendations: 1) that Miles repair the bilge blowers; and 2) tighten the port stuffing box. These repairs were made, and Royal Indemnity issued an "all risks" insurance policy to Miles insuring the boat during a one-year term commencing August 14, 1975 for a maximum sum of $26,000.00 in the event of total loss. The policy, which provided coverage "(a)gainst all risks of physical loss or damage except as may be excluded by provisions elsewhere in this policy or by endorsement hereon." The exclusion relied on by the insurance company for denying coverage was: "(l)oss, damage or expense caused by failure of Assured (Miles) to maintain the Yacht in a seaworthy condition . . . ."

The boat "Alyson" was docked at Key Allegro near Rockport. Miles hired a Mr. Clyde Hoke, a boat repairman who resided in Rockport, to keep the boat in shape and to make repairs. By the time the boat was finally docked at Key Allegro, Miles had invested approximately $21,900.00 in repairing and refinishing the hull, overhauling the engine and shafts, and investing in new equipment. During the next year, Miles' total investment in the Alyson exceeded $30,000.00. On July 19, 1976, during routine repairs repairman Hoke removed the starboard engine and sent it to San Antonio for repairs. Three days later, on July 24, 1976, the boat sank.

Miles duly notified Royal Indemnity Company within three days of the loss and submitted the necessary proof of loss forms to the company. Thereafter, Miles conferred with Jerry Jordan, the independent insurance agent who had sold Miles the insurance policy; William S. Eanes, the Claim and Loss Supervisor for Royal Indemnity; and James L. Murchison, a marine surveyor who surveyed the boat on behalf of Royal Indemnity. Believing that the damage to the boat (caused by the sinking) was unquestionably covered under the "all risks" marine insurance policy in question, Miles raised the boat and employed a Mr. Lamar Fuller to proceed with the necessary repairs. Three months after the loss, the insurance company sent Miles a letter stating that coverage for the loss would be denied because someone had left the seacock open, and, therefore, the boat was not seaworthy at the time it sank.

The underlying suit was actually a consolidation of two suits. The original plaintiff, boat repairman Clyde Hoke, sued Miles to recover $1,704.37, which represented the unpaid balance due for repair work Hoke had completed on the boat prior to the time she

sank. Miles then filed a counterclaim against Hoke alleging that his negligence (in failing to close a seacock) had caused the boat to sink. In addition, Miles filed a third-party action against Royal Indemnity seeking to recover his loss, under the insurance policy, caused by the sinking. In addition, Miles alleged, that Royal Indemnity was also liable for treble damages under the Texas Deceptive Trade Practices Act because the "agents" of Royal Indemnity had affirmatively represented to him that post-sinking repairs to the boat would be covered under the policy.

After the close of Hoke's and Miles' evidence, the trial court granted Royal Indemnity's motion for directed verdict against Miles on his cause of action under the Texas Deceptive Trade Practices Act. Thereafter, Royal Indemnity presented additional evidence and the remainder of the case was submitted to the jury. In response to special issues, the jury found, in relevant parts, as follows: 1) that "Hoke (the repairman) failed to close the through-hull fitting" on the occasion in question; 2) that such failure was not negligence; 3) that immediately prior to the boat's sinking, the boat was in a seaworthy condition; 4) that the reasonable and necessary costs of repair to restore the boat to its condition prior to the sinking was $19,894.00; and 5) that the reasonable cost for storage for the boat during the time it was repaired was $1,600.00.[1]

After the jury's verdict was received by the court, the trial judge denied Miles' motion for judgment on the verdict and granted Royal Indemnity's motion for judgment non obstante veredicto. Royal Indemnity's motion was based on the following three independent grounds: 1) The boat was in an unseaworthy condition, as a matter of law, prior to the time she sank because the seacock had been left open. 2) In the alternative, the evidence conclusively established

that the boat was properly moored under normal circumstances when she sank and Miles failed to rebut the presumption that the Alyson sunk as a result of unseaworthiness. 3) There is no evidence in the record upon which the jury could have found the proper amount of damages and, therefore, the verdict of the jury was not supported by any evidence. The trial court's take nothing judgment did not specify the reason for granting Royal Indemnity's motion.

■ Miles' first point of error is that the trial court erred in granting Royal Indemnity's motion for judgment non obstante veredicto. In considering this point, we will keep in mind the familiar rules governing the review of cases in which the trial judge has granted a judgment non obstante veredicto. First, as a general rule, the juries are the exclusive judges of the credibility of witnesses and the weight to be given to their testimony. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547 (1962). In this regard, Rule 301, Texas Rules of Civil Procedure, requires the trial court's judgment to conform to the verdict "[p]rovided, that upon motion and reasonable notice the court may render a judgment non obstante veredicto if a directed verdict would have been proper." To sustain the action of the trial court in granting a motion for judgment notwithstanding the verdict, it must be determined from the record as a whole, that there is no evidence upon which the jury could have made the findings relied upon. In considering such motion, all testimony must be viewed in the light most favorable to the party against whom the motion was sought and every reasonable intendment deducible from the evidence is to be indulged in such party's favor. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 550 (1962); *Burt v. Lochausen*, 151 Tex. 289, 249 S.W.2d 194 (1952); *Ramirez v. National Standard Ins. Co.*, 563 S.W.2d 837 (Tex.Civ.App.—Corpus Christi 1978, no

---

1. The jury answered special issues in favor of Hoke on his cause of action against Miles to recover the reasonable value of the repairs to boat Alyson prior to the time she sank. On appeal, Miles does not complain of that portion of the trial court's judgment which awarded

Hoke $1,704.37 for repair work and attorney's fees of $900.00, nor does Miles complain of the jury's failure to find Hoke negligent. There is a motion before this Court to affirm that part of the trial court's judgment which was rendered in favor of Hoke. We grant that motion.

writ); *Newitt v. Camden Drilling Co.*, 552 S.W.2d 928 (Tex.Civ.App.—Corpus Christi 1977, no writ).

As a general rule, an "all risks" policy creates a special type of coverage. Recovery under such a policy is generally allowed for all losses of a fortuitous nature in absence of fraud or other intentional misconduct of the insured, unless, of course, the policy contains a provision excluding the specific loss from coverage. (See Anno., Coverage Under All Risks Yacht Policy, 75 A.L.R.3d 410 (1977); Anno., Cover Under "All Risks" Insurance, 88 A.L.R.2d 1122 (1963).) *Brownsville Fabrics, Inc. v. Gulf Ins. Co.*, 550 S.W.2d 332 (Tex.Civ.App.—Corpus Christi 1977, writ ref. n. r. e.); *Imperial Insurance Co. v. Ellington*, 498 S.W.2d 368 (Tex.Civ.App.—San Antonio 1973, no writ). Here Royal Indemnity relies upon the "unseaworthiness" exclusion. In such a situation, Miles would have the burden of proof to negative the "unseaworthiness" exclusion contained in the policy which was plead as a defense by Royal Indemnity. *Sherman v. Provident American Ins. Co.*, 421 S.W.2d 652, 654 (Tex.1967). The relevant special issues, definitions, and instructions were to this effect.

The term "unseaworthiness" has no absolute meaning, but varies with the circumstances and the exceptional features of the case known to both the insured and the insurer. There are different degrees of seaworthiness, depending upon the character of the vessel, its construction, its navigation and service required, length and nature of the voyage, the season of the year, its trade and other factors. The degree of seaworthiness may also vary in terms of the use being made of the vessel at the particular time in question. See 37 Couch on Insurance §§ 1646–1689 (2d Ed. 1962). In order to be seaworthy, the ship and her equipment must be reasonably fit for their intended purpose. Cf. *Molis v. Ore Navigation Corp.*, 382 S.W.2d 290, 291 (Tex.Civ. App.—Houston (1st Dist.) 1964, writ ref'd n. r. e.). Seaworthiness means the ability to withstand the ordinary stress of wind, wave, and other weather which the vessel might normally be expected to encounter—in other words, to stay afloat in the absence of abnormal conditions. *Mathis v. Hanover Ins. Co.*, 127 Ga.App. 89, 192 S.E.2d 510, 511 (1972).

The lengthy trial of this case resulted in testimony comprising some three bound volumes of the statement of facts totaling approximately 1,000 pages. There is detailed testimony in the record concerning the condition of the boat, including its condition from the time Miles purchased the boat in March of 1975 to the date the boat sank, July 24, 1976. We have found ample evidence in the record that the boat was generally in a seaworthy condition immediately prior to its sinking. Gene Reddell, the yacht broker through whom Miles purchased the boat, testified that Miles had requested him to personally observe the repair work done to the boat prior to the time Miles moved and moored the boat at Key Allegro. Reddell described the repair work as good and stated that the boat was then mechanically sound and seaworthy.

The marine survey conducted by James L. Murchison, on behalf of Royal Indemnity, stated that the boat was in excellent condition. He recommended only two minor repairs which were subsequently completed by Miles. Based upon this survey, Royal Indemnity issued policy No. ROY 021450, an "all risks" policy effective from August 14, 1975, to August 14, 1976.

Soon after the boat was docked at Key Allegro in July of 1975, Miles employed Clyde Hoke to continue making improvements to the boat and to keep the boat in mechanically sound condition. Hoke testified that Miles paid him approximately $100 to $150 per month for his services. In addition, Hoke testified in detail concerning his services in maintaining the boat in "tip-top condition." The only mechanical problem which Miles had difficulty correcting concerned an overheating problem in the starboard engine. This engine had been ordered removed from the boat on at least two occasions and transported to other cities for necessary repairs.

The actual seaworthiness of the boat, which focused upon the starboard seacock, became the only real controversy between the parties. The seacock is a through-hull valve designed to allow sea water to come into the engine compartment for the purpose of cooling the engine when it is in operation. The testimony indicates that the through-hull hole in question was one and one-quarter inches in diameter which was reduced further with a pipe and then a hose to a one inch diameter hole. The seacock valve has a set lock with a wing nut to allow the valve to be completely tightened. When the engine is running, the seacock must be open in order for the sea water to properly circulate and cool the engine.

Hoke testified that on Monday, July 19, 1976, he removed the starboard engine and sent the engine to San Antonio for repairs. Hoke testified that he stuffed a shop rag in the hose and than clamped the end of the hose. He did not turn off the seacock valve. Hoke described the additional work he had done on the boat after the engine was removed and stated that he last saw the boat afloat on the following Friday (July 24). At that time, he stated that the rag was still in place and the boat was dry. The boat sank the following Saturday evening, about 32 hours after Hoke last checked her.

The testimony was undisputed from Hoke and other expert boat repairmen that stuffing rags into through-hull openings is a common and acceptable practice used by boat mechanics for temporary repairs. Hoke testified that on one previous occasion (June of 1976, when the starboard engine had been removed) he had used this same procedure with a rag. No sea water had entered the boat through the seacock on that occasion. Hoke recounted in detail the manner in which he normally stuffed a rag into such a hose in order to hold it tightly. He described folding the rag back and forth, stuffing it through the hose with a screwdriver to make it tight and then clamping the end of the hose. He testified that after that procedure, "I don't know of anybody that could ever pull one out by hand after I put it in there either, because I can't."

The insurance company takes the position that the undisputed evidence established that the seacock was open and unobstructed in any manner. We do not agree. As a matter of fact, the evidence was otherwise. The stuffing of a rag into a seacock in the manner described by Hoke did not render the moored pleasure vessel unseaworthy as a matter of law. The boat was docked at the time it sank with one of its engines removed. There is evidence in the record from several witnesses that, under normal conditions, an open seacock with a rag stuffed into a through-hull fitting is all that is necessary to prevent sea water from entering the hole. No one testified that this procedure rendered a boat unseaworthy. In fact, after the boat sank and was thereafter raised, she was towed to Ingleside for repairs without incident. Several such rags were stuffed into various through-hull openings, and throughout that trip, no sea water entered the boat.

After all of the evidence had been introduced, the following definition of "seaworthiness" was submitted to the jury:

"seaworthiness means that a vessel and all its component parts are reasonably fit for the purposes for which they are intended. It does not mean perfect, or absolutely, but implies that a failure will not occur under normal circumstances reasonably to be anticipated."

The court further instructed the jury that a vessel was presumed to be unseaworthy if she sank at her moorings and that, to rebut this presumption, Miles was required to "show the actual cause of the sinking to have been something other than an unseaworthy condition." The jury found from a preponderance of the evidence that immediately prior to the sinking of the vessel on July 24, 1976, the vessel was in a seaworthy condition. There is evidence in the record, both direct and circumstantial, from which it can reasonably be inferred that the sinking resulted from some fortuitous event. No other issues as to the exact cause of the sinking were requested by either party. No

one complained of the form in which the special issue was submitted to the jury, of the definition of unseaworthiness, or of the instructions.

The exception contained in the insurance policy, when plead as a defense, required the boat owner Miles to prove that immediately prior to the sinking, the boat in question was seaworthy. In this case, Miles was not required to prove exactly what caused the boat to sink, only that the sinking was of a fortuitous nature which the evidence shows that it was. If the boat was seaworthy just prior to its sinking, then the "all risks" marine insurance policy issued by Royal Indemnity would require the insurance company, under its contract with Miles, to pay Miles the reasonable and necessary costs of repair and storage of the boat.

The evidence and the jury's answer to the seaworthiness issue establish to our satisfaction that the boat did not sink because of an unseaworthy condition. The insurance company's reliance upon cases concerning "perils of the sea" marine insurance policies are not in point. The trial court erred in granting Royal Indemnity's motion for judgment non obstante veredicto. See *Chasse v. Newark Ins. Co.*, 109 R.I. 130, 282 A.2d 194 (1971); Anno., Coverage Under All Risks Yacht Policy, 75 A.L.R.3d 410 (1977).

We next consider whether there is competent evidence to support the jury's determination of the reasonable cost of repairing the boat after it had sunk. Miles' trial pleading alleged that the reasonable and necessary cost in Aransas County, Texas, of raising and restoring the boat to its condition prior to the sinking was $21,500.00. The jury found that $19,894.00 represented the sum of money which was reasonable and necessary to repair and restore the vessel to its condition prior to the sinking.

Royal Indemnity contends that the trial court properly granted the judgment non obstante veredicto on the ground that the jury's answer to this special issue was unsupported by competent evidence because Fuller (who had repaired the boat) had not seen the vessel prior to the time she sank and was, therefore, incompetent to testify concerning what repairs were necessary to restore the boat to its pre-sinking condition. In addition, Royal Indemnity argues that Mr. Fuller's estimate of the cost of repairs was based upon hearsay evidence because the surveyor's repair report was never offered into evidence.

Lamar L. Fuller, the owner of North Shore Boat Works in Ingleside, who had been in the business of repairing boats for fifteen years, testified that he and his employees did the repair work necessary to repair the damages to the boat which resulted from the sinking. In substance, Fuller stated that: 1) he had initially inspected the boat on Monday following the sinking after she had been raised and the water had been pumped out of her; 2) his examination included an inspection of the hull, engine compartment, through-hull fittings and openings and other parts of the yacht; 3) it appeared to him that the boat had been maintained "in good condition, in comparison to other vessels"; 4) the actual cost of his repair work, including labor and parts, was $22,000.00; 5) such repairs were necessary to put the boat "back into serviceable condition or a condition such as it was prior to the sinking"; 6) the charges were reasonable in Aransas County and in San Patricio County; and 7) the cost of storing the boat was $95.00 per month which was a reasonable charge for storing boats in both Aransas County and San Patricio County.

The testimony which Royal Indemnity contends renders Fuller's testimony incompetent was elicited upon cross examination. Royal Indemnity's attorney introduced into evidence a letter dated August 3, 1976, in which Fuller had itemized the proposed repairs and had calculated the estimated repair bill to be a total of $19,894.00 for the itemized repairs. Fuller testified that he had completed all the repairs itemized in this letter. Upon cross examination, Fuller testified that Mr. Murchison, the marine surveyor for Royal Indemnity, had come to his place of business in Ingleside to inspect the boat and to write up recommendations

for the necessary repairs. Fuller than stated that he used the marine survey as a guide for the repair work itemized in the August 3 estimate he presented to Miles, and that he followed the surveyor's recommendations concerning the repair work that was necessary to be done. The following exchange took place between Fuller and Royal Indemnity's attorney:

(Q): "All right. Now if some of those pumps were already defective, already inoperable prior to the time the boat sank, it wouldn't be necessary to replace those to put the boat back in the same condition it was in before the sinking, would it?

(A): Of course, I wouldn't have any way of knowing. But if there was an item defective before the sinking, as I said, I wouldn't know it.

(Q): All right, sir.

(A): And it wouldn't make a lot of difference. I would have to put it in anyway.

(Q): All right, sir. So, the point I'm trying to illustrate then, to get you to explain for us is: that this is not an estimate to put the boat back into the same condition as it was in before it sank, is it?

(A): Yes.

(Q): This is an estimate of what it would take to put the boat in first class condition, without regard to what its condition was before it sank?

(A): Well, of course, in my belief it's putting it back in the condition prior to the sinking. There may be things that were different or wrong with the boat prior to the sinking that I would have no knowledge of.

(Q): That's exactly the point, Mr. Fuller. You don't know what the condition of it was before it sank, do you?

(A): No, sir.

(Q): So you wouldn't know how to put it back in that same condition, would you?

(A): No, sir. Other than following the surveyor's (the insurance company's representative) recommendation.

(Q): All right, sir. And the surveyor's recommendations, and your bids, are items that the boat needs at the time and place you see it, aren't they?

(A): That's correct.

(Q): All right, sir. So it's entirely possible, as far as you know, that the air conditioning system needed replacing before it sank?

(A): That would be possible, yes.

(Q): And the only thing I'm asking you about is this: that if somebody is going to tell us that all of this was necessary as a result of the sinking, it's got to be somebody other than you, hasn't it?

(A): That's correct. The surveyor."

Fuller testified as an expert repairman. Neither in the trial nor on appeal does Royal Indemnity question his expert qualifications. Royal Indemnity is apparently complaining that Fuller's testimony has no probative value because he had not personally inspected the boat prior to the time it sank, and that he had no personal knowledge of the exact condition of the boat and its equipment immediately prior to the sinking.

It is apparent from a fair reading of Fuller's testimony in its entirety that his opinion concerning what repairs were necessary to restore the boat was based on the following factors: 1) his fifteen years experience in raising and repairing boats; 2) his personal inspection of the boat after it sank and 3) the report prepared by the surveyor in the presence of Fuller and Miles on behalf of Royal Indemnity. In spite of the fact that Fuller did not have knowledge of the Alyson's precise condition prior to the time she sank, he testified on direct and cross examination to the effect that the repairs he had made were necessary to restore the boat to a serviceable condition.

Texas courts have followed the general rule that where it appears that an expert witness' testimony is predicated upon both personal knowledge and upon hearsay, his testimony is admissible. *Slaughter v. Abilene State School*, 561 S.W.2d 789, 791 (Tex.1977); *Loper v. Andrews*, 404 S.W.2d 300, 305 (Tex.1966); *Combined Ins. Co. of America v. Kennedy*, 495 S.W.2d 306 (Tex.Civ.App.—Eastland 1973, writ ref'd n. r. e.); *Gray v. Bird*, 380 S.W.2d 908 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.); *Kansas City v. Southern Railway Co. v. Frederick*, 276 S.W.2d 332 (Tex.Civ.App.—Beaumont 1955, writ ref'd n. r. e.)

There can be no doubt that Fuller's testimony was competent and thus, of probative force as to the reasonableness and the cost of actual repairs to the vessel made by his employees under his supervision. Fuller's itemized estimate of the cost of repairs that he submitted to Miles was introduced into evidence. He testified that all of the items of repairs listed on the estimate had been completed. Fuller further testified to the effect that even if a particular listed item had been defective prior to the time the Alyson sunk, the items of repair or replacement that he completed would have been necessary as a result of the vessel's sinking.

We are of the opinion that Royal Indemnity's objections to Fuller's testimony pertained more to its weight than to its admissibility. There is no merit to the objection that Fuller had not seen the boat prior to the time it sank and could not testify as to its precise condition at that time. There is ample, detailed evidence in the record concerning the condition of the boat from the time of Miles' initial purchase, including details of his initial repair and restoration and its condition immediately preceding the time it sank. Miles had added extensive new equipment and had replaced and refinished most of the equipment in the boat. Many witnesses testified as to the boat's condition prior to the time she sank, and that it was seaworthy. See *North River Ins. Co. v. Rippy*, 23 S.W.2d 853, 857 (Tex.

Civ.App.—Fort Worth 1929, no writ); *Milby Auto Co. v. Kendrick*, 8 S.W.2d 743, 745 (Tex.Civ.App.—Galveston 1928, writ dism'd). See *Pasadena State Bank v. Isaac*, 149 Tex. 47, 228 S.W.2d 127, 129 (1950). There is no evidence of enhanced value of the boat in the record. Appellant's point of error one is sustained.

Appellant specifically requested, during oral argument, that we not consider his second point of error which complains of the trial court's action in granting Royal Indemnity's motion for directed verdict against Miles' cause of action under the Texas Deceptive Trade Practices Act, because if we were to sustain this point of error, a remand for a new trial on such action would be required. This request was granted.

The judgment of the trial court is hereby reversed and judgment is here rendered that Miles recover from Royal Indemnity the sum of $21,494.00, which represents the reasonable and necessary costs of repair and storage of the Alyson as found by the jury.

### OPINION ON MOTION FOR REHEARING

Both Appellee, Royal Indemnity, and Appellant, Charles E. Miles, have filed motions for rehearing.

Royal Indemnity complains in essence that this Court avoided the stipulated facts and exceeded its authority by finding facts contrary to "the facts which were dealt with in the District Court and upon which the parties had agreed in the District Court." Related to this complaint, Royal Indemnity contends that this Court erred by failing to hold that the boat "Alyson" was unseaworthy as a matter of law.

Contrary to Royal Indemnity's assertion, this Court did not ignore the stipulated facts. Neither party stipulated to the effect that the starboard seacock had not been closed and remained *entirely unobstructed* by any other material, such as a shop rag. Appellant Miles' theory of recovery against Hoke, the repairman, was that Hoke failed to turn off the seacock, which

failure was negligence and the proximate cause of the sinking of the vessel. As stated in our original opinion, there is testimony in the record that Hoke, although he did not turn off the starboard seacock, did stuff a rag into the opening. Appellant Miles, in support of his contention that there was sufficient evidence to support the proximate cause issue and the negligence cluster, argued to the judge that:

"We have alleged that his failure to turn off the [seacock] was the proximate cause of the sinking of the vessel.

Stuffing the rag—that was an additional thing that he did. But we have alleged that the failure to close the valve was the cause of the sinking of the vessel. And thus far in the case, that's the only thing that's been shown as a cause of the sinking of the vessel."

In response to special issues, the jury found that Hoke failed to close the through-hole fitting on the occasion in question, but that such failure was not negligence. As previously stated, other expert boat repairmen stuffed rags into through-hull openings as a common and acceptable practice.

We fail to see how statements made by appellant's attorney, such as the one above quoted, require us to ignore the evidence in the record concerning the shop rag which had been stuffed into the seacock. Appellant's cause of action as against Royal Indemnity was that he was entitled to recover under the "all risks" policy. The evidence that the shop rag had been stuffed into the seacock was not necessarily the controlling factual determination, but is rather evidentiary of the ultimate fact issue which is whether or not the Alyson was seaworthy immediately prior to the time she sank. As stated in our original opinion, the jury found the vessel seaworthy. This issue was submitted to the jury with appropriate instructions which neither party challenged on appeal.

Royal Indemnity also complains that this Court erred in not holding that the testimony of Lamar Fuller concerning the amount of money necessary to restore the Alyson to a condition she was in prior to her sinking was hearsay, because his testimony shows on its face that the only thing he knew about the condition of the vessel before the sinking was what he had been told by someone else. Royal Indemnity contends that Fuller could not testify that the repairs which were made were necessary as a result of the sinking because he had no personal knowledge of the condition of the vessel before she sank. Accordingly, Royal Indemnity contends that all of his testimony concerning the condition of the vessel before she sank was hearsay and, since his testimony was the only testimony in the record relating to the cost of repairs, the damage award is based exclusively upon hearsay, and therefor there is no evidence to support the jury's verdict.

The distinction Royal Indemnity is attempting to point out on motion for rehearing is not clear. We are still of the opinion that Fuller's testimony as an expert witness had probative value in determining the reasonable and necessary cost of repairs to the Alyson as a result of the vessel's sinking.

Finally, Royal Indemnity presents the final complaint that this Court erred in reversing the trial court's judgment (non obstante veredicto) and in awarding damages for storage of the Alyson. There is nothing in the record showing that Royal Indemnity objected to the special issue concerning storage costs on the ground that the special issue inquired into an amount which was not covered by the policy nor did Royal Indemnity's motion for judgment non obstante veredicto state that the jury's answer to that special issue should be disregarded on the basis that such damages were not covered under the policy in question. There is nothing in appellee's appellate brief by way of cross-point or any other statement stating that this is not an amount covered by the policy. While we note that the trial record does contain a special exception by Royal Indemnity challenging Miles' pleadings on the basis that storage was not covered under the policy, there is absolutely nothing in the record to indicate that such special exception was brought to the trial court's attention to be acted upon.

In addition, Miles' motion for judgment on the jury's verdict states as a grounds therefor that the costs of storage should be recovered pursuant to paragraph eight of the general provisions pertaining to the "all risks" policy in question. This assertion was not contradicted in any way by Royal Indemnity. It is too late for Royal Indemnity to bring this complaint to our attention on motion for rehearing. See: *Wright v. Gernandt*, 559 S.W.2d 864 (Tex.Civ.App.—Corpus Christi 1977, no writ). Royal Indemnity's motion for rehearing is hereby overruled.

Miles, in his motion for "correction of judgment or for rehearing," complains that this Court failed to award pre-judgment interest at the rate of 6% per annum, and post-judgment interest at the rate of 9% per annum. The pre-judgment interest request on motion for rehearing is a troublesome question in this case. Miles contends that he is entitled to receive pre-judgment interest from the date Royal Indemnity denied insurance coverage for the loss in question, October 8, 1976, until the date of judgment. Miles' pleadings prayed for recovery under the policy of insurance issued by Royal Indemnity for the cost of repairs to the Alyson plus storage, "plus costs of Court, and such other and further relief, both general and special, at law and in equity, to which he may be justly entitled." Miles contends that this general prayer is a sufficient basis upon which to award both pre- and post-judgment interest.

Royal Indemnity, on the other hand, complains that there is no evidence in the record as to the date Royal Indemnity denied liability pursuant to the terms of the policy because the letter (cross-plaintiff's exhibit number 8) upon which Miles relies was never introduced into evidence. In addition, Royal Indemnity complains that the damages Miles sought to recover cannot be considered unliquidated within the general rule which allows pre-judgment interest on damages for unliquidated demands when the principal damages are determinable and established at a definite time, either by the rules of evidence or known standards of value because such damages were not "de-terminable and established at a definite time." (See *McDaniel v. Tucker*, 520 S.W.2d 543 (Tex.Civ.App.—Corpus Christi 1975, no writ).

Justice McGee writing on behalf of our Supreme Court in *Republic National Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109, 116 (Tex. 1979), stated the following general rule concerning pre-judgment interest:

"Prejudgment interest is that interest calculated on the sum payable to the plaintiff from the time of his loss or injury to the time of judgment. It is recoverable as a matter of right where an ascertainable sum of money is determined to have been due and payable at a date certain prior to judgment." (Citations omitted.)

Pre-judgment interest can be allowed eo nominee only where it is so provided for by contract or statute. *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 483 (Tex.1978). Pre-judgment interest can also be awarded as damages in certain instances under equitable principles as compensation for the use or detention of money. See *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 485–88 (Tex.1978). Where pre-judgment interest is sought at common law as an element of damages, the plaintiff must plead for it. *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 117 (Tex.1979). An award for pre-judgment interest eo nominee, pursuant to Tex.Rev.Civ.Stat.Ann. art. 5069–1.-03 (1971) may be based upon a prayer for general relief if the plaintiff pleads and proves a written contract ascertaining a sum payable on date certain. *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 117 (Tex.1979).

In this case, Miles' motion for rehearing fails to disclose whether pre-judgment interest is being sought eo nominee pursuant to art. 5069–1.03 or as damages, because rules pertaining to each are cited by him without distinction. It is clear, however, that pursuant to the general rules, Miles cannot recover pre-judgment interest as damages because his claim for

such interest is supported only in his trial pleadings with a prayer for general relief. We further note that, although Miles filed a motion for judgment on the jury's verdict supported by an exhibit containing his proposed judgment, neither the motion nor the proposed judgment mention pre-judgment interest. In addition, although Miles' original appellate brief and reply brief contain specific prayers which, in substance, request our Court to reverse the trial court's judgment non obstante veredicto and to render judgment in accordance with the jury's answers to special issues, neither of his appellate briefs mention pre-judgment interest nor do they contain a prayer for general relief to support such award.

■ We move to the critical question: Is Miles entitled to recover pre-judgment interest eo nominee pursuant to Tex.Rev. Civ.Stat.Ann. art. 5069–1.03 (1971). This statute provides, in pertinent part, as follows:

"When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable . . ."

In order for Miles to be entitled to recover pre-judgment interest eo nominee within the meaning of article 5069–1.03, it was incumbent upon him to plead and prove "a written contract ascertaining a sum payable at a date certain prior to judgment." *Republic National Bank v. Northwest National Bank*, 578 S.W.2d 109, 116–17 (Tex.1979). The Texas Supreme Court has long construed the requirement that a contract "ascertaining a sum payable" is satisfied when the following general conditions are met:

"[T]he words, 'ascertaining the sum payable' have reference to the sum or amount the party executing the obligation may be reasonably expected or required to pay, in view of all the circumstances incident to the matter or business he is contracting about, if by reason of the provision of the contract he becomes at any time liable to pay thereunder; and *it is not necessary . . . that the contract shall itself establish a fixed lia-*

*bility in a definite amount as of a date certain. It is sufficient . . . if the* contract provides the conditions upon which liability depends and fixes a measure *by which the sum payable can be ascertained with reasonable certainty,* in the light of the attending circumstances. We think the statute should be construed as applying to contracts where, in case of liability arising from contingencies occurring after its execution, the obligor is furnished the means or opportunity of ascertaining with reasonable certainty the extent of liability or the sum he may be expected to pay." *Federal Life Ins. Co. of Chicago v. Kriton*, 249 S.W. 193 (Tex.Comm'n App.—1923, opinion adopted). (Emphasis added).

The insurance policy upon which Miles relied was introduced into evidence and is sufficient to constitute a contract ascertaining a sum payable within the meaning of article 5069–1.03.

■ The question of whether Miles proved that such sums were due and payable at a date certain prior to judgment is the next question to be answered. It has been generally stated that where an insurer denies liability under the terms of an insurance policy where no payment date is stated in the policy, and thereafter the insured establishes the insurer's liability pursuant to the policy, pre-judgment interest will commence from the date the insurer denied liability. *Liberty Mutual Ins. Co. v. General Insurance Corp.*, 517 S.W.2d 791 (Tex.Civ. App.—Tyler 1974, writ ref'd n. r. e.); *Fort Worth Lloyds v. Hale*, 405 S.W.2d 639 (Tex. Civ.App.—Amarillo 1966, writ ref'd n. r. e.); compare *Fisch v. Transcontinental Insurance Company*, 356 S.W.2d 186 (Tex.Civ. App.—Houston [1st Dist.] 1962 writ ref'd n. r. e.). Although the express terms of the insurance policy required Miles to give Royal Indemnity "immediate written notice with full particulars" in the event of a loss which could give rise to a claim under the policy provisions, the policy itself does not state a date or time limit for Royal Indemnity to pay such claim. In order to establish the date certain for payment, Miles relies upon the letter of October 8, 1976, wherein Royal Indemnity denied insurance

coverage for the damage caused by the sinking of the Alyson. This letter, however, was not introduced into evidence. Arguably then, Miles cannot recover pre-judgment interest eo nominee because he failed to prove a date certain prior to the entry of judgment when an ascertainable sum became payable.

A different result, however, was reached in *New York Underwriters Ins. Co. v. Coffman*, 540 S.W.2d 445, 457–58 (Tex.Civ.App. —Fort Worth 1976, writ ref'd n. r. e.), where the Court held in effect that pre-judgment interest was recoverable and would commence on the date the insurance company first denied liability under the policy which, in that case, was the date the company filed its original answer denying liability. Since Miles had prayed for general relief, we enter the judgment the trial court should have entered. Rule 434, T.R. C.P.

We therefore grant Appellant Miles' motion for rehearing and grant pre-judgment interest from October 7, 1977, when the record shows Royal Indemnity denied liability (original answer to third party complaint filed October 7, 1977) until date of judgment, January 18, 1978, at 6% and post-judgment interest at the rate of 9% from the date of judgment until paid.