TEXAS EASTERN TRANSMISSION CORPORATION, Plaintiff-Appellee,

v.

MARINE OFFICE–APPLETON & COX CORPORATION, Defendant,

and

Kansas City Fire & Marine Insurance Company, Defendant-Appellant,

Fenix & Scisson, Inc., Intervenor-Appellee.

No. 76–1885.

United States Court of Appeals, Tenth Circuit.

June 23, 1978.

Rehearing Denied Aug. 4, 1978.

Ronald R. Hudson, Oklahoma City, Okl. (Page Dobson, Oklahoma City, Okl., William C. McAlister, E. D. Hieronymus, John H. Tucker, Tulsa, Okl., with him on brief), of Rhodes, Hieronymus, Holloway & Wilson, Oklahoma City, Okl., and Tulsa, Okl., for defendant-appellant.

Burton J. Johnson of Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., Paul E. Stallings, Houston, Tex. (Eleanor Swift Glass, Houston, Tex., with him on brief), of Vinson & Elkins, Houston, Tex., for plaintiff-appellee Texas Eastern Transmission Corp.

T. Hillis Eskridge, Tulsa, Okl. (David B. McKinney, Tulsa, Okl., with him on brief), of Boesche, McDermott & Eskridge, Tulsa, Okl., for intervenor-appellee Fenix & Scisson, Inc.

Before SETH, Chief Judge, and LEWIS and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is a diversity case involving coverage under an insurance contract in a dispute between the insureds, Texas Eastern Transmission Corporation (Texas Eastern or

plaintiff) and Fenix & Scisson, Inc. (Fenix & Scisson or intervenor) on the one hand and Kansas City Fire & Marine Insurance Company (Kansas City Fire & Marine or defendant), the insuror. Damages were stipulated, and the issue of liability under the policy was tried to a jury which found for Texas Eastern and Fenix & Scisson against Kansas City Fire & Marine, which has appealed to this Court.

A considerable amount is in controversy, as the judgments totalled $1,655,425.69. Issues on appeal include questions of interpretation of the insurance contract, burden of proof, jury instructions, allegedly prejudicial evidence, counsel's argument to the jury, venue, and whether post-judgment interest was improperly awarded on prejudgment interest.

Briefly the action involves the collapse of an underground storage cavern being constructed to hold approximately 200,000 barrels of liquified petroleum gas, at a time when construction was about 97% completed. The cavern was being built near Lick Creek, Illinois, by Fenix & Scisson for Texas Eastern. The parties had acquired an "all risks" insurance policy from Kansas City Fire & Marine. The policy defines the property covered as:

> LPG underground cavern consisting of shaft and mined cavern and all labor and completed work or work in progress, including any and all materials, equipment, machinery and appurtenances in which the Insured has an interest or for which the Insured may be liable or assumed liability prior to loss or damage, to be used in or incidental to the installation or completion of: 200,000 barrel cavern at Texas Eastern Transmission Corporation's Terminal near Lick Creek, Illinois.

Under the heading "perils insured" it states:

> This policy insures against all risks of direct physical loss of or damage to the property covered, except as provided elsewhere in this policy.

Under the heading "perils not insured," as relevant here, it provides:

> This policy does not insure against:

1. Loss, damage or expense caused by or resulting from error, omission, or deficiency in design, specifications, workmanship, or materials . . .

. . . . .

7. Loss, damage or expense caused by or resulting from dryness or dampness of atmosphere; . . .

The cavern collapsed in the middle of the night, at a time when no one was in it and the only persons known to be on the job site were two night security guards at the surface. There was no obvious earthquake, explosive sound or other unusual phenomenon except popping and cracking of the tin shaft construction building and settling of the earth. After the collapse it was impossible to enter the cavern, and the shafts were so full of rock that not even a TV camera could be lowered to a point where it could provide a meaningful look at the damage.

When plaintiff and intervenor sought payment under the insurance policy they merely listed the origin and cause of the loss as "collapse" of the cavern. The defendant refused to pay in a letter asserting "there is no indication that this loss was caused by a fortuitous occurrence but on the contrary the indications up to this point are that the loss falls within the exclusions set out in the policy."

At trial plaintiff and intervenor showed that Fenix & Scisson was the pioneer in the construction of LPG underground storage caverns, having built approximately 70 of them, about 90% of all such facilities in the noncommunist countries of the world. This was the fourteenth cavern it had constructed for Texas Eastern.

They presented evidence that a feasibility study and plans and specifications had been prepared and presented to Kansas City Fire & Marine at the time of application for the insurance policy, prior to commencement of construction. This was the 11th successive cavern Fenix & Scisson had insured with Kansas City Fire & Marine under similar policies. No objections to the plans were

made by the insuror, and no inspections or complaints were made during construction prior to the collapse.

Evidence at the trial by plaintiff and intervenor was to the effect that the design of the Lick Creek cavern was similar to that of 31 caverns previously built in shale by Fenix & Scisson which were completed and placed in operation without any problems. Much evidence was introduced as to the room and pillar method of construction used here and in the other caverns, and testimony was presented by various witnesses, some qualified as experts, to the effect that this was by all appearances a good cavern which should not have collapsed. Some of the witnesses had made inspections within a few days of the collapse. One exhibit was a drawing containing dimensions of spaces and pillars made from a survey completed less than ten days prior to the collapse. Various theories were advanced by different witnesses, but they did not agree as to the probable cause of the collapse.

Defendant's evidence concentrated generally upon showing that the cavern was in poor condition throughout much of the construction period, with water present, and much slabbing and sluffing off of the pillars. Its evidence tended to show pillar failure as the cause of the cave-in, with the pillars too small to support the weight of the overburden. It also presented testimony that an earthquake, even if one occurred, would be unlikely to cause the collapse, and that sabotage was virtually impossible as a potential cause of the loss.

## I

The most important issue here is the proper interpretation of the insurance policy in the context of the facts of this case. The policy is admitted to be "all risks," a standard type of insurance of increasing popularity.

> A policy of insurance insuring against "all risks" is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery under the policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage. No case has been found denying the above proposition, . . . (footnotes omitted).

Annot., 88 A.L.R.2d 1122, 1125 (1963).

■ The general rule, in accordance with the trial court's instructions to the jury in the instant case, is that the burden is upon the insured to prove that a loss occurred and that it was due to some fortuitous event or circumstance. *See British and Foreign Marine Ins. Co., Ltd., v. Gaunt,* [1921] 2 A.C. 41; *Atlantic Lines Ltd. v. American Motorists Ins. Co.,* 547 F.2d 11 (2d Cir. 1976). Then the burden shifts to the defendant to show that the loss was one excluded by some language set out in the policy.

The Restatement of Contracts § 291, comment a (1932) defines fortuitous event in terms of the parties' expectations:

> A fortuitous event . . . is an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties.

Acknowledging as authority such cases as *British and Foreign Marine Ins. Co., Ltd.,* which hold that the insured need not prove the cause of loss, defendant here asserts that as a practical matter proof of cause of the loss is necessary in order to establish that the loss was by a fortuity. Defendant's theory is that the collapse was caused by a deficiency in the design of the underground cavern, that the evidence supports only that conclusion, but that the insured parties also must lose because they failed to establish an "external" cause of the collapse.

Defendant's contentions are similar to those made in *Plaza Equities Corp. v. Aetna*

*Casualty and Surety Co.,* 372 F.Supp. 1325 (S.D.N.Y.1974) where a 7,000 pound sculpture was attached to the roof of a shopping center, without supporting columns being added to the roof. The loss was found to be within the deficiency in design exclusion when the sculpture fell through the roof because the underlying structures would not support it.

The problem in the context of this case is that it is difficult to see what risks the insurance company was insuring against if the defendant's position is upheld. Its own expert testified that most earthquakes would not cause the cavern to collapse if it was properly constructed, and that it would be very difficult for saboteurs to set charges which would make a pillar collapse. No danger of fire, windstorm or the like would exist in this underground cavern.

Fenix & Scisson is the principal contractor in the entire world with respect to this type of structure. It had built approximately 70 underground storage caverns before undertaking this one, of which 31 were in shale formations which it believed were substantially similar to the substructures here. Those 31 were successfully completed and functioning at the time of the contract and later trial. Feasibility studies Fenix & Scisson made indicated no essential differences between the underlying geology involved here and the other shale caverns it had built. The plans and specifications, which it submitted along with its feasibility study to the insurance company prior to the entering into the insurance contract, were for a design similar to the other shale caverns, calling for room and pillar construction of the same type and using supporting columns of the same size as before.

In the context of the instant case we believe the facts support a finding that the parties intended to insure against collapse of the cavern under the circumstances which occurred here. When past experience indicated that this particular design would be satisfactory, and it was not for some reason which is uncertain, a fortuitous event occurred within the loss provisions of the contract, not excluded by the "deficiency in design" clause.

Texas Eastern and Fenix & Scisson met their burden of proof by showing the feasibility study, plans and specifications, their submission to the insurance company as a basis for the issuance of the policy, and the similarity to the previously constructed caverns which were satisfactorily completed. They presented evidence of several experts that this was a good cavern, to all appearances, shortly before the event and one which should not have collapsed.

There was testimony that the cavern as constructed deviated somewhat from the precise dimensions of the columns and spacings in the plan, caused either by modification required when an unexpected fault was encountered, or workmen's error. Negligence of the employees of the contractor is not an excluded peril under the contract, as defendant admits. *See Equitable Fire and Marine Insurance Co. v. Allied Steel Construction Co.,* 421 F.2d 512 (10th Cir. 1970). And the cases hold that if there is a concurrence of negligence and an excluded peril such as an inherent defect, then coverage applies under an "all risks" policy. *E. g., General American Transportation Corp. v. Sun Insurance Office, Ltd.,* 369 F.2d 906 (6th Cir. 1966).

To a great extent the cases in this area are *sui generis* because they turn upon the peculiar facts involved which are different in each situation. There are several cases which we believe are analogous, however.

In *General American Transportation Corp. v. Sun Insurance Office, Ltd., supra,* the project involved erection of an underground silo as a part of a propulsion engine altitude test facility. During the time fresh concrete was being poured to complete the cap of the structure, a temporary shoring platform collapsed under the weight of the concrete and the entire temporary steel falsework and the fresh concrete fell 250 feet to the bottom of the silo, killing four people and causing vast property damage. Workmen's error in the prefabrication of a flange on a truss, which apparently failed and permitted increased deflection of the truss, resulting in local or general buckling

and overloading of adjacent trusses, was found to be one of the causes of the loss. Against an argument that the collapse was inevitable as the direct result of a faulty design, the court affirmed a finding of coverage under an "all risks" policy.

In *Essex House v. St. Paul Fire and Marine Ins. Co.,* 404 F.Supp. 978 (S.D.Ohio 1975), there was a brick failure on an insured commercial building whereby a considerable portion of the face brick detached from the back-up block and fell to the ground. Upon a showing of numerous deficiencies in the construction of the brick facing creating conditions of overstress, the insurer attempted to escape liability under an "inherent or latent defect" exclusion. The court held the collapse to be a fortuitous event covered by the policy and not within the exclusion claimed by the insuror.

In *Millers Mutual Fire Ins. Co. v. Murrell,* 362 S.W.2d 868 (Tex.Civ.App.1962) a house partially collapsed as a result of earth movement beneath it. The all risks policy had exclusions for "settling, shrinkage, or expansion in foundations, walls, floors, or ceilings," except for "landslide, total or partial collapse   .   .   ." The insuror argued that the earth movement which caused the damage was inevitable hence not fortuitous; it was certain from the time the house was built that the damage would happen, and therefore there was no risk to be insured. All of the experts testified, after examining the soil under the home, that damage like that which occurred was inevitable. Still the court held that the policy coverage applied, obviously rejecting the type of reasoning urged by Kansas City Fire & Marine in the instant case.

## II

■ Some of defendant's objections to the jury instructions result from a different view of the policy language than that taken above, on the essential elements to be proved by the insured parties and affirmative defenses by the insurance company. We hold that in the context of this case the trial judge adequately instructed on the definition of fortuity and on the affirmative defenses.

The proper rule of construction is stated in *Equitable Fire and Marine Ins. Co. v. Allied Steel Construction Co.,* 421 F.2d 512, 513 (10th Cir. 1970), applying Oklahoma law, in the context of an all risks policy with the same deficiency in design exclusion involved here:

> The primary attempt must be to construe the contract so as to give effect to all the provisions, giving the terms their plain and ordinary meaning. And where there are exceptions or exclusions in the policy which exempt the insurer from certain specified risks, those exemptions are to be construed strictly against the insurer when their application is doubtful (footnote omitted).

*See also Universal Underwriters Ins. Co. v. Bush,* 272 F.2d 675 (10th Cir. 1959).

There was an issue of ambiguity here, really a fact issue, as to the intention of the parties with respect to the exclusions in the context of this policy covering cavern construction. The instructions must be viewed as a whole, *Connecticut Fire Ins. Co. v. Fox,* 361 F.2d 1, 6 (10th Cir. 1966); so considered, they properly informed the jury of its responsibility and were not prejudicial.

## III

At trial there was testimony and comments of counsel concerning labor unrest, previous acts of sabotage and vandalism on the cavern project, and inferences that sabotage could be a cause of the loss. On this appeal the insurer contends that this evidence is irrelevant under Fed.R.Evid. 401, or if relevant, its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues, and hence it should have been excluded in accordance with Fed.R.Evid. 403.

■ The determination of whether the evidence is relevant is a matter within the sound discretion of the trial court, and we will not disturb that decision on appeal absent a showing of a clear abuse of discretion. *Young v. Anderson,* 513 F.2d 969 (10th Cir. 1975). *See also* 1 Weinstein's

Evidence ¶ 401[01], at 401–7 (1977). Even though the evidence is found to be relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Fed.R.Evid. 403. The burden also falls on the trial court to balance the probative value of the evidence against its potential for prejudicing the jury, and we will not reverse that determination absent an abuse of discretion. *Rigby v. Beech Aircraft Co.,* 548 F.2d 288 (10th Cir. 1977).

■ We cannot say the trial judge abused his discretion in allowing the introduction of testimony concerning labor violence on the project. There had been substantial damage at the project in an early labor dispute, and the National Labor Relations Board handed down a decision against the local union, finding it guilty of unfair labor practices, just about 12 days prior to the cavern collapse. Our review of the record indicates that this evidence did not play a major role in the trial. It was presented as just one of several possibilities for a cause of the collapse. Most mention of it was actually in the statements of counsel. There were no comments or inferences that the men who testified for defendant were involved in the earlier sabotage or had anything to do with the cavern's collapse.

## IV

■ Defendant Kansas City Fire & Marine claims the closing argument of plaintiff's counsel prejudiced the jury. Counsel's references to defendant as an insurance company from New York trying to get away without paying legitimate claims in Oklahoma is said to be inflammatory and calculated to prejudice the jury.

This case was hotly contested by excellent attorneys representing parties who are all relatively large corporations. Counsel vigorously pursued their respective theories. Under those conditions an appellate court must rely upon an experienced trial judge to keep the trial within the bounds of decorum and justice. Major deviations rendering the proceeding a circus are grounds for

reversal, but the conduct must be highly reprehensible.

> [A]ppellate courts should exercise great caution in setting aside a judgment because of remarks made by counsel in closing argument during a hotly contested case, and even though the argument be improper, the judgment should not be disturbed unless it clearly appears that the remarks in question unduly aroused the sympathy of the jury and thereby influenced the verdict.

*Julander v. Ford Motor Co.,* 488 F.2d 839, 842 (10th Cir. 1973). There is no indication in the record that counsel objected to the statements prior to filing its motion for new trial.

We have read the jury arguments of the lawyers. They were all somewhat emotional, and no doubt the one complained of was more "country" than the others. But all were good examples of the art of jury argument, and we see no prejudicial error in any of those arguments, viewed as a whole.

## V

■ Defendant asserts that the trial court abused its discretion when it refused to transfer the trial to Illinois, where the collapsed cavern was located. A district court may transfer any civil action for the convenience of the parties and witnesses and in the interests of justice to any forum where the action could have been brought. 28 U.S.C. § 1404(a). The moving party has the burden to show that the existing forum is inconvenient. Plaintiff's choice is also given considerable weight. *Texas Gulf Sulphur Co. v. Ritter,* 371 F.2d 145, 147 (10th Cir. 1967).

> The transfer lies within the sound judicial discretion of the trial judge and his determination should not be rejected unless the appellate court can say there has been a clear abuse of discretion. (Footnote omitted.)

*Id.*

■ The contract was proposed and executed in Oklahoma. The parties agree that Oklahoma law governs this dispute. Okla-

homa was plaintiff's choice of forum; it is not clearly an inconvenient forum. Although most witnesses did not reside in the district where the trial took place, proximity to the courthouse is only one factor to consider in a § 1404(a) motion. The decision of the trial court was not clearly an abuse of discretion.

## VI

■ ·Finally, Kansas City Fire & Marine contends that the award of post-judgment interest upon prejudgment interest was improper.

> At pretrial the parties stipulated that:
>   Any principal amount recoverable herein will bear interest at the rate of six per cent (6%) per annum from December 27, 1973, to date of judgment, and thereafter as provided by law.

In our opinion this stipulation contemplates that if the insurance company should lose, as it did, the amount payable under the policy (later stipulated by the parties) should bear interest at six per cent until the date of the district court's judgment. Thereafter, during a period of appeal or until otherwise paid, the entire judgment, including· the accrued six per cent interest, would bear interest at the legal rate provided by law. The law of Oklahoma controls and provides ten per cent interest from the date of rendition of the judgment. 28 U.S.C. § 1961; Okl.Stat. tit. 12, § 727.

■ But even if the stipulation is not to be given that effect, the general rule is that "a judgment bears interest on the whole amount ·thereof, although such amount is made up partly of interest on the original obligation, and even though the interest is separately stated in the judgment." 47 C.J.S. Interest § 21b (1946) (footnotes omitted). Oklahoma law is in accord with this rule. *First National Bank and Trust Co. v. Exchange National Bank and Trust Co.,* 517 P.2d 805 (Okl.App.1973); *Nichols v. T.I.M. E.–D.C., Inc.,* 373 F.Supp. 811 (E.D.Okl. 1973).

For the reasons stated, the judgment is AFFIRMED.