**CXY CHEMICALS U.S.A.**

v.

**GERLING GLOBAL GENERAL INSURANCE COMPANY, et al.**

**Civil Action No. 96–2198.**

United States District Court, E.D. Louisiana.

Jan. 23, 1998.

M. Hampton Carver, David Lyman Browne, Edwin L. Hightower, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, New Orleans, LA, for Plaintiff.

John Thomas Nesser, III, Liane King Hinrichs, Margaret Mary Sledge, Nesser, King & LeBlanc, New Orleans, LA, for Defendants.

### ORDER AND REASONS

LEMMON, District Judge.

Considering the memoranda of counsel and the applicable law, IT IS ORDERED that defendant's Motion to Continue Hearing on Plaintiff's Motion for Partial Summary Judgment (Doc. # 37) be and hereby is DENIED.

IT IS FURTHER ORDERED that plaintiff's Motion for Partial Summary Judgment with Respect to Liability (Doc. # 29) be and hereby is DENIED.

The court assigns the following reasons for its rulings.

### I.  BACKGROUND

Plaintiff CXY Chemicals U.S.A. ("CXY") filed suit in the 29th Judicial District Court for the Parish of St. Charles, State of Louisiana, against defendants Gerling Global Insurance Company ("Gerling"), Cigna Insurance Company of Canada ("Cigna"), Liberty Mutual Insurance Company ("Liberty"), International Oil Insurers ("IOI"), Generali, and Gjensidige Skadeforsikring, to recover the proceeds of a policy of insurance issued by the defendants to the plaintiff. Plaintiff alleges that the policy of insurance at issue covers damages suffered at its sodium chlo-rate producing chemical plant located in Taft, Louisiana.

Defendants removed this case to federal court and subsequently filed a Motion to Dismiss or, in the Alternative, Stay Proceedings, in which the defendants sought to have this case stayed pending the outcome of a related, previously filed suit pending in Canada or to dismiss plaintiff's claim pursuant to the doctrine of *forum non conveniens.* This court denied defendants' motion. Plaintiff filed a Motion for Partial Summary Judgment with Respect to Liability, in which it argues that it is entitled to summary judgment in its favor on the issue of whether the insurance policy issued by the defendants covers the damages suffered by the plaintiff. Defendant filed a Motion to Continue Hearing on Plaintiff's Motion for Partial Summary Judgment in which they argue that they need more time to conduct discovery.

### II.  MOTION TO CONTINUE HEARING

Defendants argue that they need more time to conduct additional discovery in order to fully address the issue of whether Alberta's substantive law or Louisiana's substantive law governs the interpretation of the insurance policy in this case. Specifically, defendants argue that "[d]iscovery of the facts surrounding the solicitation, negotiation, underwriting, delivery and payment of premiums under the Policy is necessary before there may be any meaningful consideration of the conflicts of laws or choice of laws issues." Plaintiff argues that the defendants are merely seeking to stall a ruling on plaintiff's Motion for Partial Summary Judgment with Respect to Liability in order for the Canadian court overseeing the parallel Canadian litigation to rule on the issue first.

Rule 56(f) of the Federal Rules of Civil Procedure provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be

had or may make such other order as is just.

In *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435 (5th Cir.1993), the Fifth Circuit discussed the requirements of Rule 56(f), stating:

> To obtain a continuance of a motion for summary judgment in order to obtain further discovery, a party must indicate to the court by some statement, preferably in writing (but not necessarily in the form of an affidavit), why he needs additional discovery and how the additional discovery will create a genuine issue of material fact.
>
> . . . .
>
> if it appears that further discovery will not produce evidence creating a genuine issue of material fact, the district court may, in the exercise of its discretion, grant summary judgment.

*Krim*, 989 F.2d at 1442 (internal citations omitted); *see also Netto v. Amtrak*, 863 F.2d 1210, 1216 (5th Cir.1989) ("entitlement to discovery before a ruling on a motion for summary judgment is not unlimited and may be cut off when the record shows that the requested discovery will not be likely to produce facts he needs to withstand a summary judgment motion").

Plaintiff does not dispute that the insurance policy at issue in this case was "solicited, negotiated, issued, delivered and paid for" in Alberta. Defendants fail to specify particularly what type of facts "surrounding the solicitation, negotiation, underwriting, delivery and payment of premiums under the Policy," they hope to uncover and precisely how the results of this further discovery might be material to the question of whether Alberta's substantive law or Louisiana's substantive law applies to the interpretation of the insurance policy in this case.[1] Therefore, it appears that further discovery on these issues will not produce facts which would create a genuine issue of material fact with respect to the question of whether Alberta's substantive law or Louisiana's substantive

law governs the interpretation of the insurance policy in this case. Accordingly, this court declines to continue the hearing of plaintiff's Motion for Partial Summary Judgment with Respect to Liability.

## III. MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff argues that it is entitled to partial summary judgment that the insurance policy in this case affords coverage for the damages plaintiff alleges to have suffered at its sodium chlorate producing chemical plant. The parties do not dispute the following facts which form the basis of plaintiff's claim. Plaintiff's chemical plant produces sodium chlorate through a process utilizing electrolytic cells, each of which contains internal electrodes known as cathodes and anodes. A solution of sodium chloride brine is fed to each cell and a direct current is supplied to the cell through the cathodes and anodes. The resulting reactions produce sodium chlorate.

On June 6, 1995, several electrical bus bars failed. On June 12, 1995, plaintiff stopped operations at the plant to repair the damage to the electrical bus bars and, according to its procedures, added hydrogen peroxide to the cells to terminate production and added sodium hydroxide to the cells to raise the pH levels within the cells during the shut-down. On June 15, 1995, plaintiff resumed operations at the plant and, according to its procedures, lowered the pH levels in the cells and applying electrical currents to the cells. During this resumption of operations, the preferential deposition of silica from the solution of sodium chloride brine in the cells damaged the anodes, resulting in an interruption of plaintiff's business. Plaintiff seeks to recover for the costs of replacing the anodes, which it alleges to be approximately $7,022,650.00, and for the damages suffered as a result of the interruption of its business, which it alleges to be approximately $6,697,947.00.

---

1. Additionally, subsequent to the hearing date of this motion, the defendants submitted the deposition testimony of Robert Sutherland, Gerling's Vice President and Regional Manager for the Western Regional Office in Calgary, regarding the facts surrounding the confecting of the contract of insurance. This deposition has been received by the court and considered in the ruling.

## A. Choice of Law[2]

█ Plaintiff argues that Louisiana's substantive law governs the interpretation of the insurance policy in this case. A federal district court exercising diversity jurisdiction under Section 1332 of Title 28 of the United States Code must apply the choice of law provisions of the state in which the court exists to determine which state's substantive laws apply. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *e.g., Perez v. Lockheed Corp. (In re Air Disaster at Ramstein Air Base, Germany)*, 81 F.3d 570, 576 (5th Cir.), *amended by* 88 F.3d 340 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 583, 136 L.Ed.2d 513 (1996). Article 3515 of the Louisiana Civil Code provides:

> Except as *otherwise provided in this Book,* an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue. That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La.C.C.Art. 3515 (emphasis added). The Revision Comments following Article 3515 state:

> This Article applies only to cases that fall within the scope of this Book and that are not "otherwise provided [for] in this Book". Thus, this is the residual article. *If any other article in this Book is found to be applicable to a particular case or issue, that article prevails.* However, Article 3515 also serves as the general article, in the sense that it contains the general principles from which the other articles of this Book have been derived and in light of which they should be applied.

La.C.C.Art. 3515 Revision Comments 1991 (emphasis added). Article 3540 of the Louisiana Civil Code provides:

> All other issues of conventional obligations are governed by the law *expressly chosen or clearly relied upon by the parties,* except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

La.C.C.Art. 3540 (emphasis added). In the present case the insurance policy at issue does not contain a choice of law provision and therefore the court must turn to Article 3537 of the Louisiana Civil Code which governs the choice of law in cases involving conventional obligations and provides:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue. That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La.C.C.Art. 3537. The Revision Comments following Article 3537 state:

> This Article establishes the general approach for selecting the law applicable to conventional obligations.... In essence, this Article applies in the absence of an effective choice of law by the parties.

La.C.C.Art. 3537 Revision Comments (a) 1991. Revision Comment (c) explains the

---

**2.** For an excellent discussion of the general principles and history underlying conflicts of law and choice of law, see Lea Brilmayer, *Conflicts of* *Law, in* FUNDAMENTALS OF AMERICAN LAW 177, 177–197 (Alan B. Morrison ed.1996).

relationship between Louisiana Civil Code Articles 3537 and 3515:

(c) **Relation to Article 3515.** The first paragraph of this Article enunciates the objective of the choice-of-law process for contract conflicts in language that is purposefully identical to that of the first paragraph of Article 3515. These two Articles and the comments accompanying them are intended to be read together. As in Article 3515, supra, the objective is to identify "the state whose policies would be most seriously impaired", that is, the state that, in light of its connection to the parties and the transaction and its interests implicated in the conflict, would bear the most serious legal, social, economic, and other consequences "if its law were not applied" to the issue at hand. As envisioned by this Article, the search for the applicable law should not be a mechanical, quantitative process, but should be based on an objective and impartial evaluation of the consequences of the choice-of-law decision on each of the involved states with a view towards accommodating their respective interests rather than selfishly promoting the interests of one state at the expense of the others.

The second paragraph of this Article prescribes the process or method for attaining the objective enunciated in the first paragraph in language that is parallel to, though more specific than, the language employed in the second paragraph of Article 3515. Article 3537 adds specificity to the description of this process by: providing an illustrative list of the factual contacts that are usually pertinent in contract conflicts; by adding to the list of "policies mentioned in Article 3515" certain sets of policies that are ex hypothesi pertinent in contract conflicts; and by providing that the evaluation of the strength and pertinence of the involved policies is to be made "in the light of ... the nature, type, and purpose of the contract".

Revision Comment (d) to Article 3537 of the Louisiana Code of Civil Procedure describes the process by which a court may analyze the relevant state law policies at issue under Article 3537:

(d) **The process.** Thus, the first step of the process is to identify "the relevant policies of the involved states". A state is considered "involved" when it has any of the factual contacts expressly listed in the second paragraph of this Article or included by implication in the phrase "pertinent contacts". The "relevant policies" of that state are identified through the resources of the interpretative process by focusing on the specific rules of substantive contract law whose applicability is being urged in the particular case. The second step of the process is to evaluate "the strength and pertinence of [these] policies ... in the light of" the three sets of factors listed in the second paragraph, to wit: (I) the factual contacts of each involved state to the parties and the transaction; (ii) the "nature, type and purpose of the contract"; and (iii) the policies listed in clause (3).

Thus, Article 3537 calls upon the court to identify the "pertinent contacts" involved in this case, the relevant policies of the states [3] having these contacts, the strengths and pertinence of these policies in light of several enumerated factors, and ultimately, "the state whose policies would be most seriously impaired if its law were not applied" to the issue before the court. Article 3517 of the Louisiana Civil Code also superimposes on this analysis the opportunity for the court to consider whether the alternative state would apply its own laws to the issue before the court, providing:

Except as otherwise indicated, when the law of another state is applicable under this Book, that law shall not include the law of conflict of laws of that state. *Nevertheless, in determining the state whose law is applicable to an issue under Articles 3515, 3519, 3537, and 3542, the law of*

3. Article 3516 of the Louisiana Civil Code provides:

As used in this Book, the word "state" denotes, as may be appropriate: the United States or any state, territory, or possession thereof; the

District of Columbia; the Commonwealth of Puerto Rico; and *any foreign country or territorial subdivision thereof that has its own system of law.*

La.C.C. Art. 3516 (emphasis added).

*conflict of laws of the involved foreign states may be taken into consideration.* La.C.C.Art. 3517 (emphasis added).

### 1. Pertinent Contacts

In determining what the "pertinent contacts" of the parties are, Article 3537 directs the court to consider:

the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; . . . .

#### a. Transaction

The parties do not dispute that the transaction, "including the place of negotiation, formation, and performance of the contract," as that phrase is used in Article 3537, took place in Alberta, Canada.

#### b. Object of the Contract

Likewise, the parties do not dispute that the "location of the object of the contract," the insured property which forms the basis of plaintiff's claim, is in Louisiana.

#### c. Domicile, Habitual Residence, or Business

■ As this court stated in its previous ruling on defendants' Motion to Dismiss or, in the Alternative, Stay Proceedings;

Plaintiff, CXY, is a Delaware partnership having its principal place of business in Taft, Louisiana. It is a partnership owned 85% by CXY Chemicals USA, Inc., a corporation organized under the laws of the state of Delaware, having its principal place of business in Louisiana, and 15% by Occidental Chemical Corporation, which is a corporation organized under the laws of the State of New York, having its principal place of business in Texas.

Reasons and Order (Doc. # 23). Occidental Chemical Corporation and CXY Chemicals, U.S.A., Inc., the partners that own plaintiff, are themselves subsidiaries of Canadian Oc-

cidental Petroleum, Limited ("COPL"), which has its principal place of business in Alberta, Canada.[4] Article 3518 of the Louisiana Civil Code governs the determination of a party's domicile for purposes of Louisiana's conflicts of laws provisions, providing:

For the purposes of this Book, the domicile of a person is determined in accordance with the law of this state. A juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue.

Revision Comment (c) to Article 3518 of the Louisiana Civil Code provides:

Although it is often said that a juridical person has its domicile in the state of its incorporation, closer examination reveals that such an assertion is usually confined to matters pertaining to the internal affairs of corporations. Even in this context, the assertion is subject to exceptions. *When the issue pertains to the external relations of a corporation with third parties, the place of incorporation is usually less important than the principal place of business.* Rather than choose a priori between the places of incorporation and principal place of business, this Article leaves the choice to the court. The choice will be guided by the principles of Article 3515 and will depend on the issue involved and the circumstances of the particular case.

La.C.C.Art. 3518 Revision Comments (c) 1991 (emphasis added). The issues involved in the present case involve the plaintiff's external relationship with the defendants rather than the internal affairs of the plaintiff and therefore the plaintiff's "domicile" for purposes of Article 3518 and Article 3537 is plaintiff's principal place of business. Thus, although plaintiff was formed in Delaware it is plaintiff's principal place of business which is most pertinent to the issues before the court and, as previously noted by this court, plaintiff's principal place of business is Louisiana. Defendants Gerling and Cigna have their principal place of business in Ontario,

---

**4.** Although the named insured on the policy of insurance is COPL, an endorsement to the policy of insurance, which forms the basis of plaintiff's claim, specifically extends coverage to the plaintiff's sodium chlorate plant in Louisiana for an additional premium of $469,502.00.

Canada; defendant Liberty has its principal place of business in Massachusetts; defendant 101 has its principal place of business in the United Kingdom; defendant Generali has its principal place of business in Italy; and defendant Gjensidige Skadeforsikring has its principal place of business in Norway. Accordingly, none of the parties in the present case have their "domicile, habitual residence, or business," as that phrase is used in Article 3537, within Alberta, Canada.

### 2. Relevant policies

Although, several widely-varying states have contacts with the parties in this case, the only states whose policies are alleged by the parties to be relevant to the issues in this case are those of Alberta and Louisiana. In identifying the policies of these states, Revision Comment (d) to Article 3537 of the Louisiana Code of Civil Procedure notes:

> The "relevant policies" of that state are identified through the resources of the interpretative process by focusing on the specific rules of substantive contract law whose applicability is being urged in the particular case.

In the present case, the "specific rules of substantive contract law whose applicability is being urged" are those of Alberta and Louisiana which govern the interpretation of insurance contracts.

The policy ostensibly underlying Alberta's laws governing the interpretation of insurance contracts is its interest in regulating the insurance industries doing business within its borders. More specifically, Alberta has an interest in guaranteeing that its citizens are able to recover the benefits of insurance policies to which they are parties and thereby avoid becoming a burden on the economy of Alberta. Alberta also has the converse interest in guaranteeing that it is an attractive place for insurers to conduct business, thereby encouraging the economic growth of Alberta. Louisiana has the same interests in regulating insurance—to protect insureds who reside within its borders and to foster an attractive environment for businesses within its borders.

Although the plaintiff's owners' parent company, COPL has its principal place of business in Alberta, and the defendants all conduct business in Alberta, none of the defendants in this case have their principal place of business in Alberta. Thus, Alberta's contact with the parties in this case and the transaction which forms the basis of plaintiff's claim is limited to the fact that the defendants conduct business in Alberta and the contract was formed in Alberta. Thus, Alberta's policy of protecting in-state beneficiaries of insurance policies is not relevant in the present case because the plaintiff is not an instate beneficiary. Accordingly, the only relevant policy of Alberta which might be impaired if its laws were not applied to the present case is its policy of facilitating a business-friendly environment for insurers conducting business in Alberta.

Conversely, Louisiana's contact with the parties in this case and the transaction which forms the basis of plaintiff's claim is limited to the fact that the plaintiff's principal place of business is in Louisiana and Louisiana is the location of the relevant object of the contract—plaintiff's sodium chlorate producing chemical plant. Thus, Louisiana's policy of facilitating a business-friendly environment for insurers conducting business in Louisiana is not relevant in the present case because the insurers are not conducting business in Louisiana. Accordingly, the only relevant policy which might be impaired if its laws were not applied to the present case is its policy of protecting in-state beneficiaries of insurance policies.

### 3. State whose policies would be most seriously impaired

Because the plaintiff's principal place of business is in Louisiana and none of the defendants have Alberta as their principal place of business, Louisiana's policy of protecting its insured citizenry would be more seriously impaired if Louisiana's laws were not applied to this case than Alberta's policy of facilitating a business-friendly environment for its insurance industries would be if Alberta law were not applied. Because Louisiana's contacts to the plaintiff and to the relevant object of the contract is stronger than Alberta's contacts to the defendants and to the transaction itself, Louisiana's policy

would be more impaired if Alberta's law were applied than Alberta's policy would be if Louisiana's law were applied. Moreover, because the object of the insurance policy at issue is in Louisiana, Louisiana's related interest in protecting its citizens who are tangentially effected by damage to the object of an insurance policy, in this case, those who are dependent on the economic effects that plaintiff's sodium chlorate producing chemical plant has on the local economies in Louisiana, might be seriously impaired if Alberta's law applied. Alberta has no converse interest.

Article 3537 also calls for consideration of the strength and pertinence of the relevant policies of the states in light of:

> the nature, type and purpose of the contract; and ... the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

Likewise, Article 3517 calls for the consideration of whether the foreign jurisdiction would apply its laws to the case before the court. These considerations do not change the court's analysis.

First, the "nature, type and purpose of the contract" only reveals that this is an insurance contract entered into by the defendants and the plaintiff's owners' parent company, the relevant portion of which extends previously acquired insurance coverage to the plaintiff. This fact does not make the relevant polices of Alberta and Louisiana, as previously delineated, stronger or more pertinent. Second, the policies referred to in Article 3515, "the policies and needs of the interstate and international systems, including the upholding of justified expectations of parties and minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state," likewise do not have any relevant effect on the strength and pertinence of the policies of Alberta and Louisiana, as previously delineated. Although certainly the defendants may not have expected or anticipated that Louisiana law would apply to the insurance policy at issue and the court's application of

Louisiana law could theoretically subject the defendant to the laws of multiple jurisdictions, the defendants had the option of contractually pre-determining which jurisdiction's laws will apply to a dispute arising out of the insurance policy by including a choice of law provision in the policy. Third, for the same reasons, the "policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other" do not strengthen or make the relevant policies of Alberta and Louisiana, as previously described, more pertinent.

Finally, assuming without deciding that Alberta would apply its own substantive law to the present case, this fact would not effect the court's ultimate conclusion that Louisiana's policies would be most seriously impaired if its laws were not applied in this case. Accordingly, Article 3537 requires the application of Louisiana law in the present case.

### B. *Insurance Policy*

The defendants issued a policy of insurance in this case, No. RSLC0971, dated December 5, 1994, which identified the insureds as:

> CANADIAN OCCIDENTAL PETROLEUM LTD. and each subsidiary, affiliated or associated corporation or other entity, which may now exist or be hereafter constituted, over which Canadian Occidental Petroleum Ltd. may exercise direct or indirect control.

The policy of insurance also provides:

1.1 *INSURING AGREEMENTS*

This Policy, subject to the conditions, exclusions and limitations herein set forth, insures:

(a) ALL PROPERTY of every kind and description not hereinafter excluded at all locations wherever situated, including property in the course of or awaiting construction or installation, being property of the Insured or in which the Insured has an insurable interest, or for which the Insured may be legally liable, or for which the Insured may have assumed liability or risk, or for which the

Insured may have agreed to carry insurance on behalf of others or have instructions to carry insurance on behalf of others.

(b) BUSINESS INTERRUPTION.

1.2 *PERILS INSURED*

This Policy insures against ALL RISKS of direct physical loss of or damage to the property insured except as hereinafter provided.

1.3 *PERILS EXCLUDED.*

This Policy does not insure against loss or damage caused or resulting from any of the following regardless of any cause or event contributing concurrently or in any sequence to the loss:

. . . .

(h) The cost of making good faulty workmanship, material, construction or design from any cause, unless physical damage not otherwise excluded by this Policy results, in which event this Policy will cover only such resulting damage.

. . . .

(j) Deterioration, depletion, rust, corrosion, wear and tear, inherent vice or latent defect, unless physical damage not otherwise excluded by this policy results, in which event this Policy shall cover only such resulting damage;

(k) Shrinkage or change in colour, texture or finish, unless such damage results directly from other physical damage not otherwise excluded by this Policy;

. . . .

(m) Loss by pollution, contamination, evaporation, shortage, seepage, spillage or leakage, including cost of cleaning-up operations, unless resulting from direct physical loss or damage by a peril not otherwise excluded by this Policy (cost of clean-up operations shall not apply for expenses of removal of any substance

which is discharged, released or escapes into or upon any watercourse or body of water);

. . . .

(q) Loss or damage resulting from mechanical breakdown of machinery unless loss or damage by a peril not otherwise excluded ensues, and then only for the actual loss or damage caused by such ensuing peril not otherwise excluded;

. . . .

(r) Loss or damage caused by electrical arcing, electrical injury or electrical breakdown, but not excluding resultant loss or damage from a peril not otherwise excluded;

. . . .

3.1 *BUSINESS INTERRUPTION*

This section insures against any loss resulting directly from:

(a) BUSINESS INTERRUPTION—necessary total or partial interruption of the Insured's business and the consequent reduction in Gross Earnings caused as a result of property damage covered under Section 2;

1. *Fortuity*

Defendants argue that the damages allegedly suffered by plaintiff were not fortuitous and therefore, under Louisiana law, plaintiff may not recover under the policy of insurance at issue.

a. *Definition of "Fortuity"*

In addition to the express exclusions contained in a policy of insurance which provides coverage for "all risks," courts have imposed a necessity that the loss of the insured also be "fortuitous" in nature. *See* Stephen A. Cozen & Richard C. Bennett, *Fortuity: The Unnamed Exclusion*, 20 FORUM 222, 222 (1985).[5] In *Dow Chemical v. Royal Indem-*

---

**5.** In their article, Cozen and Bennett describe the historical roots and theoretical underpinnings of the "fortuity doctrine," noting:

The doctrine was first described at length by British and American courts shortly after World War I, in *British & Foreign Marine Ins. Co. v. Gaunt* and *Mellon v. Federal Ins. Co.* In the half-century since then, no decision has questioned its validity, and courts have recog-

nized and accepted the rationales that underlie the doctrine. Allowing insurance coverage on a certainty would violate public policy and encourage fraud; an insurance policy is not a warranty of soundness, and the carrier's obligations do not extend to damage that is not occasioned by external or extraneous forces.

. . . .

*nity Co.*, 635 F.2d 379 (5th Cir. Unit A Jan. 1981), the Fifth Circuit, in applying Texas law governing the interpretation of insurance contracts, stated:

> A policy of insurance insuring against 'all risks' creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.... Texas jurisprudence is to similar effect: 'As a general rule, an "all risk" policy creates a special type of coverage. Recovery under such a policy is generally allowed for all losses of a fortuitous nature in the absence of fraud or other intentional misconduct of the insured, unless, of course, a policy contains a provision excluding the specific loss from coverage.'

*Royal Indemnity*, 635 F.2d at 385 (quoting *Miles v. Royal Indemnity Co.*, 589 S.W.2d 725, 729 (Tex.Civ.App.1979), *writ refused n.r.e.* (Tx.1980)).

Subsequently, in *U.S. Indus., Inc. v. Aetna Casualty & Surety Co.*, 690 F.2d 459 (5th Cir.1982), the Fifth Circuit, in a case in which Louisiana's substantive law governed the interpretation of an insurance contract, restated the same proposition enunciated in *Royal Indemnity* —an "all-risks" policy of insurance only covers "fortuitous" losses which do not result from misconduct or fraud. *Aetna Casualty*, 690 F.2d at 461. In *Aetna Casualty*, the Fifth Circuit relied on the "fortuity doctrine" as previously discussed in *Royal Indemnity*. Although *Royal*

*Indemnity* involved an interpretation of an insurance policy under the substantive laws of Texas, *Aetna Casualty*, as a diversity case brought in a federal court in Louisiana, apparently applied the substantive laws of Louisiana to the interpretation of the insurance policy at issue. Thus, the Fifth Circuit apparently assumed that the "fortuity doctrine" under Texas law is the same under Louisiana law.

In *Morrison Grain Co. v. Utica Mutual Insurance Co.*, 632 F.2d 424 (5th Cir.1980), a case preceding both *Royal Indemnity* and *Aetna Casualty* and in which the Fifth Circuit was applying general federal maritime law to the interpretation of an insurance policy, the Fifth Circuit defined the term "fortuitous" as used in the "fortuity doctrine" consistently with Section 291 comment (a) of the First Restatement of Contracts, which states:

> A fortuitous event ... is an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties.

*See Morrison Grain*, 632 F.2d at 431–32.[6] By adopting the definition contained in Section 291 of the Restatement of Contracts, which focuses on the knowledge of the parties, the Fifth Circuit has adopted the "modern rule" as discussed by Cozen and Ben-

---

If risk is central to insurance, then certainty is antithetical to it. The requirement that any loss be accidental in some sense in order to be compensable is implicit in the very nature of insurance.
Stephen A. Cozen & Richard C. Bennett, *Fortuity: The Unnamed Exclusion*, 20 FORUM 222, 222, 224 (1985) (internal citations omitted).

**6.** Louisiana Civil Code Article 1875, which is located in that section of the Louisiana Civil Code which governs obligations in general and the defense of impossibility of performance, states:

> A fortuitous event is one that, at the time the contract was made, could not have been reasonably foreseen.

Louisiana Civil Code 3506(15), which defines various terms used in the Louisiana Civil Code, states:

> Fortuitous Event.—Fortuitous event is that which happens by a cause which we can not resist.

Because *Aetna Casualty*, in which the Fifth Circuit applied Louisiana law, did not reference the Louisiana Civil Code in applying the "fortuity doctrine," this court will apply the definition of fortuity under Louisiana's "fortuity doctrine" consistently with the definition set forth in *Morrison Grain*.

780

nett.[7]

### b. *Burden of Proof*

In *Morrison Grain,* the Fifth Circuit also noted that the insured bears the burden of proving that a loss was fortuitous, stating:

> There is certainly a substantial body of authority which suggests that in an action under an "all risks" policy the insured must sustain such a burden. We are not troubled by this authority, . . . .

*Morrison Grain,* 632 F.2d 424, 430 (omission added) (internal citations omitted); *see also Texas Eastern Transmission Corp. v. Marine Office–Appleton & Cox Corp.,* 579 F.2d 561, 564 (10th Cir.1978) ("The general rule, in accordance with the trial court's instructions to the jury in the instant case, is that the burden is upon the insured to prove that a loss occurred and that it was due to some fortuitous event or circumstance").

### c. *Summary Judgment Standard*

A party is entitled to summary judgment upon a showing that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992); Fed.R.Civ.Proc. Rule 56(c). A material fact is any fact "that might affect the outcome of the suit under the governing law." *Anderson,* 106 S.Ct. at 2510. In making its determination as to whether summary judgment is appropriate, the Court must draw all justifiable inferences in favor of the non-moving party. *Anderson,* 106 S.Ct. at 2513; *Oliver Resources PLC v. International Finance Corp.,* 62 F.3d 128, 130 (5th Cir.1995).

### d. *Analysis and Conclusion*

■ In the present case, defendants present a memo allegedly written by the plaintiff's president, T.A. Sugalski to J.M. Oertling of COPL dated December 15, 1994, which states:

> III. Finally, the most attractive option is to boost Taft II to 160KA and add six more cells and achieve 90,000 STPY at a cost of probably no more than $2MM. Shutdown Taft I completely or run at 50KA (32,000 STPY) until burnout.

Defendants also present the deposition testimony of plaintiff's manager, James Schultz, which states:

> Q: So in May of 1995, when CXY accepted ownership of this plant, there was an indication that there was a coating problem with the cells?
>
> A: Yeah. There had been an indication prior to that, but I'm not exactly sure when. But there was a presentation right around the time that we were made aware of just what the situation was.
>
> . . . .
>
> A: We were aware that there was an issue or concern with the anode coatings.

Defendants argue that the above quoted evidence indicates that plaintiff was aware that to continue operating the plant without replacing the anodes would inevitably lead to the exact event that transpired. These facts surrounding the determination of whether the damages alleged to have been sustained by plaintiff were inevitable and, if so, whether plaintiff knew of the inevitability of these damages are material to the question of

---

**7.** As Cozen and Bennett note, the "fortuity doctrine" has evolved over time from requiring only an objective inquiry to a subjective one:

> The older cases used an objective standard to gauge whether loss was fortuitous or not. If the loss was inevitable under every known physical and mechanical law, then it could not be deemed to be a 'risk' insured against. The knowledge or ignorance of the insured was irrelevant.
>
> . . . .
>
> The modern rule, however, ignores any 'concept of risk taking' that was in the underwriter's mind. It matters not whether loss was a

physical certainty, but only whether the insured was aware that that loss would occur. Moreover, . . ., this is a completely subjective standard. The court's inquiry is limited to the knowledge of the named insured at bar; it makes no difference whether a reasonable and prudent insured would have been aware that loss was imminent. The rule flows from the definition of 'a fortuitous event' that is found in comment (a) of section 291 of the Restatement of Contracts (1931), . . . .

Stephen A. Cozen & Richard C. Bennett, *Fortuity: The Unnamed Exclusion,* 20 FORUM 222, 239–40 (1985) (omissions added).

whether the damages were "fortuitous" within the meaning of the "fortuity doctrine." If in fact the plaintiff knew that the plant would inevitably suffer the damages of which it now complains and proceeded forward despite that knowledge then the damages of which plaintiff complains were not "fortuitous." From the evidence submitted by the defendants in opposition to the plaintiff's motion, a reasonable jury could find that in fact the plaintiff had this knowledge. Accordingly, plaintiff is not entitled to summary judgment.[8]

---

**8.** Because the court finds that material issues of disputed fact exist, the court declines to address at this time the issue of whether the damages plaintiff complains of are excluded from coverage by the terms of the policy.